# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
December 3, 2002 Session

## STATE OF TENNESSEE v. PHILIP R. WORKMAN

**Direct Appeal from the Criminal Court for Shelby County**
**No. B-81209      John P. Colton, Jr., Judge**

---

**No. W2002-00300-CCA-R3-PD  - Filed December 30, 2002**

---

Petitioner, who received the death penalty at his original trial in 1982, now appeals the trial court's denial of his petition for writ of error coram nobis.  On appeal, he contends the trial court should have granted relief based upon the recantation testimony of an alleged eyewitness and a newly discovered post-mortem x-ray of the victim.  He further contends the trial court erred in prohibiting the testimony of an original trial juror who would testify that the recantation testimony and the newly discovered evidence would have affected the juror's verdict in the original trial.  We conclude that the trial court's order reflects varying and sometimes inappropriate standards of review for coram nobis proceedings; nevertheless, the actual findings by the trial court are sufficient for this court to conclude that the trial court found no reasonable probability that the new evidence would have affected the jury's verdict.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

John W. Pierotti and Robert L. Hutton, Memphis, Tennessee, for the appellant, Philip R. Workman.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Joseph F. Whalen, Assistant Attorney General; William L. Gibbons, District Attorney General; and John W. Campbell and Jerry R. Kitchen, Assistant District Attorneys General, for the appellee, State of Tennessee.

W. Mark Ward, Assistant Shelby County Public Defender; and Steven J. Mulroy, Memphis, Tennessee, for the *Amicus Curiae*, Tennessee Association of Criminal Defense Lawyers.

## OPINION

It is the petitioner's contention in this coram nobis proceeding that the bullet that took the life of the victim, Lt. Ronald Oliver of the Memphis Police Department, was not fired from petitioner's .45 caliber pistol; instead, he contends Lt. Oliver was killed by "friendly fire."  It

appears undisputed that Lt. Oliver was killed on August 5, 1981, when he and Officer Aubrey Stoddard were attempting to apprehend the armed petitioner, who was under the influence of cocaine and had just exited Wendy's after committing an armed robbery. Further, it appears to be undisputed that the petitioner did, in fact, fire the bullet that struck Officer Stoddard in the arm near the time Lt. Oliver was shot. However, petitioner contends he cannot be guilty of the felony murder of Lt. Oliver, and we assume of any degree of homicide, if his bullet did not cause Lt. Oliver's death. As we read our supreme court's opinion remanding this matter to the trial court for the coram nobis hearing, it likewise agrees the defendant cannot be guilty of felony murder if his bullet did not, in fact, cause Lt. Oliver's death. *See* Workman v. State, 41 S.W.3d 100, 101 (Tenn. 2001). Thus, we proceed upon this assumption.

## PROCEDURAL HISTORY

In 1982, a Shelby County jury convicted the petitioner of first degree murder in perpetration of robbery and sentenced him to death. The Supreme Court of Tennessee affirmed both the conviction and the death sentence. State v. Workman, 667 S.W.2d 44 (Tenn.), *cert. denied,* 469 U.S. 873, 105 S. Ct. 226, 83 L. Ed. 2d 155 (1984). Subsequently, petitioner sought post-conviction relief which was denied by the trial court; this court affirmed the denial. Philip Ray Workman v. State, C.C.A. No. 111, 1987 Tenn. Crim. App. LEXIS 2500 (Tenn. Crim. App. Feb. 18, 1987, at Jackson), *perm. to app. denied* (Tenn.), *cert. denied*, 484 U.S. 873, 108 S. Ct. 209, 98 L. Ed. 2d 160 (1987). Subsequently, an amended petition for post-conviction relief was filed and dismissed by the trial court; this court affirmed the denial. Workman v. State, 868 S.W.2d 705 (Tenn. Crim. App.), *perm. to app. denied* (Tenn. 1993). Petitioner subsequently sought federal habeas corpus review, which was denied. Workman v. Bell, 178 F. 3d 759 (6th Cir. 1998), *cert. denied,* 528 U.S. 913, 120 S. Ct. 264, 145 L. Ed. 2d 221 (1999).

Thereafter, petitioner filed a petition for writ of error coram nobis in the trial court. Although the trial court dismissed the petition based upon the statute of limitations, our state supreme court remanded to the trial court for a hearing on the merits. Workman v. State, 41 S.W.3d 100 (Tenn. 2001). Upon remand, the trial court denied relief. This appeal followed.

## UNDERLYING FACTS

The following summary of facts appeared in our state supreme court's opinion in petitioner's original direct appeal:

> There is little controversy concerning the material facts. The murder for which defendant stands convicted occurred shortly after 10:00 p.m. on August 5, 1981. Defendant entered Wendy's restaurant on Thomas Street in Memphis, Tennessee, just before closing time. He purchased food at the counter and dawdled over it until the restaurant closed. The defendant then, at gunpoint, herded the employees and a customer of the restaurant into the manager's

office, where he told the manager to put the day's receipts (around $1,170.00) into a bag. Defendant took an employee's car keys, ordered everyone to remain in the office, locked the door and left. During the robbery, the defendant informed the employees that he had an accomplice, not as "cool" as he was, who would shoot if any employee disregarded defendant's orders.

Unknown to the defendant, an employee had tripped the restaurant's silent alarm. Lt. Ronald Oliver of the Memphis Police Department met the defendant, just as the defendant was leaving the restaurant. Just what occurred at that time is not clear in the record. There is testimony, however, that Lt. Oliver and the defendant left the restaurant together. Thereafter, the defendant broke away from Lt. Oliver and ran. When defendant did not stop at Lt. Oliver's command, Lt. Oliver and Officer Aubrey Stoddard grabbed the defendant. The defendant broke free of the officers, shot Lt. Oliver in the chest and Officer Stoddard in the arm, fired a second shot at Stoddard, and fled toward the auto parts store next to Wendy's. The defendant paused in his flight long enough to fire one bullet at a third police officer, who had arrived at the crime scene. Lt. Oliver died as the result of the chest wound.

Police officers sealed off the area behind Wendy's and the auto parts store. After an extensive search of the area by police using attack dogs, defendant was found hiding in the underbrush. His .45 caliber pistol was found nearby.

Defendant was taken from the crime scene to the hospital in a squad car for treatment of cuts and scratches on his face and body, dog bites, and wounds to his buttocks. On the way and after being advised of his *Miranda* rights, defendant told the officers he had robbed Wendy's because he needed money to leave town. He gave the officers a false name and address, later explaining that he wanted to avoid embarrassment to his family.

Defendant was treated in the hospital emergency room and released to the police. Very shortly thereafter, defendant was viewed in a "lineup" by the employees of Wendy's, who had been locked in the manager's office in the course of the robbery. Each of the employees identified defendant as the robber. At the trial, though defendant's appearance was different, the employees identified defendant as the robber.

The defendant testified at the trial and admitted both the robbery and the killing, but tried to show he was a drug addict and

under the influence of drugs at the time of the crimes. He insisted he
was trying to give up when he was "hit or grabbed" by the officers,
and that it was after that that he shot Stoddard and Oliver. He also
testified that he could only remember "bits" and "pieces" of the
events of the evening.

Workman, 667 S.W.2d at 46-47.

Although not set forth in the opinion on direct appeal, Harold Davis testified at trial that he was in the parking lot when the victim was shot. Davis stated that he observed the petitioner shoot the victim. Other testimony indicated Lt. Oliver, after he was shot, was able to fire his weapon six times. In addition, Dr. James Spencer Bell, a forensic pathologist, testified that the cause of death was a "large caliber gunshot wound. . . . Above a .22 or .25 caliber weapon." The only questions asked of Dr. Bell upon cross-examination were whether the victim could remain conscious after receiving the wound, whether the victim could be overcome by shock during the four-minute period of time he could have lived after the wound, and whether the doctor actually knew whether the victim was conscious or in shock after the wound.

Petitioner testified at trial that he possessed a .45 caliber pistol at the time of the crime. Gerald F. Wilkes, a ballistics expert with the Federal Bureau of Investigation, testified at trial regarding various pieces of ballistic evidence found at the scene. He opined that a spent hollow point bullet found at the scene was fired by the .45 caliber weapon which was also found at the scene. He further opined that the spent cartridge casings found at the scene were fired from the same .45 caliber weapon. Wilkes acknowledged that he would normally expect a .45 hollow point bullet that was fired into the human body to exhibit more damage than the particular bullet found at the scene. He further acknowledged this particular bullet did not appear to have any blood, human tissue or other substance on it.

## CORAM NOBIS HEARING TESTIMONY

### A.    Testimony of Harold Davis

At the coram nobis hearing, petitioner presented the testimony of Harold Davis, who testified at the original trial that he observed the petitioner shoot the victim. His coram nobis testimony is the epitome of confusion.

Davis began his testimony by stating he did not see the petitioner shoot the victim, and his trial testimony was untrue. On cross-examination, he acknowledged he had developed a substantial drug problem and had generally led an unsavory life after the trial of this case; however, he did acknowledge that on the night of the crime he was "smoking some weed" and "drinking." Nevertheless, he insisted he was a different person at the time of trial, came to the police station voluntarily and told the authorities what he had seen, and had no reason to lie at the time of trial. At another point, he stated he selected the petitioner's picture for the authorities because he had seen

it in the newspaper; however, it was stipulated the petitioner's picture had not appeared in the newspaper prior to the photo lineup.

On redirect examination, Davis again seemed to emphatically indicate that he did not see the petitioner shoot the victim, and his trial testimony was untrue. Nevertheless, on recross-examination, he stated the only thing he really remembered was pulling into the parking lot and could not remember anything that happened thereafter until he left the lot. On several occasions, he stated he was presently unable to differentiate between "fact or fiction" as to what occurred after he entered the parking lot. He also acknowledged he had a series of strokes which have affected his memory.

The testimony of Davis consumes approximately three hundred pages of transcript in which he at various times emphatically states he did not see the petitioner shoot the officer; on other occasions, he emphatically states he cannot remember what occurred once he entered the parking lot. After reviewing the transcript in its entirety, it appears the essence of Davis's testimony can be best summarized in the following exchange:

> Prosecutor: You're not saying you lied, right?
>
> Davis: Right.
>
> Prosecutor: Ok. In the trial, you're not saying- -
>
> Davis: Right.
>
> Prosecutor: - -You lied about that?
>
> Davis: Right. I'm not saying that.
>
> Prosecutor: You just don't know.
>
> Davis: I just don't remember. I just don't know. . . .

In addition, Davis denied that he was with Vivian Porter on the night of the homicide.

## B. Testimony of Vivian Porter

Petitioner also presented the testimony of Vivian Porter in an effort to corroborate Davis's alleged recantation. Porter testified she was a reformed drug addict and was presently employed as the director of a charity which provides housing for women who are battered or in drug recovery. She acknowledged she was a drug addict at the time of this crime and, in all, was a drug addict for approximately twenty-two years. She testified she was with Davis on the night in question; both were smoking marijuana, snorting cocaine, and drinking and had done so for days; they went by the Wendy's parking lot when all the policemen were present; they never turned into the parking lot; she was not concerned at that time about a policeman being killed; she was "an addict" and was

"drug trafficking" at that time; and she did not even know Davis testified at the trial. In addition, the following exchange occurred:

> Prosecutor: Then 18 years later you have complete recall through all the drugs and everything else- -
>
> Porter: That's right. I have been delivered- -
>
> Prosecutor: - -Exactly what happened?
>
> Porter: I've been delivered. God can do that. God can do that. He'll give you your memory back.

## C. Photographic Stipulation

At the coram nobis hearing, the parties stipulated that a photograph taken by a newspaper photographer thirty minutes after the shooting did not reflect the presence of Davis's car in the Wendy's parking lot.

## D. Testimony of Dr. Cyril H. Wecht

The parties stipulated at the coram nobis hearing that an x-ray taken of the victim shortly after his death was not available to the defense until March 2, 2000, and that the petitioner was without fault in failing to obtain it prior to that time. Dr. Cyril H. Wecht testified at the coram nobis hearing concerning the bullet that killed the victim.[1]

Dr. Wecht, a forensic pathologist and Coroner of Allegheny County, Pennsylvania, opined at the hearing that the bullet found at the scene of the homicide was not the bullet that killed the victim. He noted that the exit wound would not be typical of a .45 caliber aluminum jacketed hollow point bullet allegedly fired by the petitioner. As to the x-ray, Dr. Wecht noted that there was no evidence of fragmentation which he would normally expect from a .45 caliber hollow point bullet.

As the primary bases for his opinion, he noted the bullet "[e]xited the body [and] did not fragment, [the] exit wound was smaller [than the entrance wound], [the] bullet was not deformed or mushroomed, and the bullet contained no blood debris or tissue on it when examined by the FBI." He had already reached his conclusion prior to observing the x-ray, but stated the x-ray corroborated his opinion.

---

[1] Petitioner, in his federal habeas corpus proceeding, utilized Dr. Kris Sperry relating to the type of bullet used to kill the victim. *See* Workman v. Bell, 178 F.3d 759, 766 (6th Cir. 1998). This was prior to the discovery of the x-ray. Dr. Sperry did not testify at the coram nobis hearing.

On cross-examination, Dr. Wecht acknowledged that it was indeed possible that a .45 caliber hollow point bullet killed the victim, and that the fatal bullet was never recovered. He also acknowledged his understanding that the officers used .38 caliber weapons with hollow point bullets, which he would also expect to leave a larger exit wound than entrance wound. Furthermore, he acknowledged that aluminum fragments from a .45 caliber hollow point bullet might not show up on an x-ray, and that small fragments could have been removed as a part of the medical procedures performed in the attempt to save the victim's life. He did not dispute the following opinions of another expert:

> First, it should be said that hollow point bullets do not mutilate organs or destroy them any more than their solid nose, all lead counter parts [sic] of the same caliber.
>
> The wounds and the skin, as well as those integral [sic] organs, are the same in appearance and extent for both types of ammunition. One cannot examine the wounds in a body and say that an individual was shot with a hollow point rather than a solid lead bullet. No organs are reduced to chopped meat by a handgun bullet.

He also acknowledged another expert's opinion that it was a "myth" that "hollow point ammunition bullets fragment or blow up in the body" and agreed that fragments from a hollow point bullet may break off especially if it strikes bone, but "the breakup is not significant." However, he opined that aluminum jacketed hollow points were more likely to fragment than copper jacketed hollow points.

## TRIAL COURT'S FINDINGS

In an extensive twenty-three page order, the trial court concluded that neither the alleged recantation testimony nor the newly discovered x-ray warranted coram nobis relief. Specifically, the trial court found the confusing testimony by Davis did not amount to a recantation and was neither clear nor persuasive. The trial court was unable to conclude that Davis's testimony at the original trial was false. Further, the trial court concluded the testimony of Vivian Porter did not warrant a new trial.

As to the newly discovered x-ray, the trial court noted that the ballistics information and the autopsy report were available prior to trial, and the newly discovered x-ray was merely corroborative of Dr. Wecht's previously formed opinion. The trial court also noted the similarities of the testimony of the ballistics expert who testified at the original trial and the testimony of Dr. Wecht at the coram nobis hearing. Both agreed that one would expect to see more deformation if the recovered bullet was, in fact, the bullet that killed the victim. After reviewing the evidence presented at trial, including the petitioner's admissions, the trial court was unable to "reasonably conclude" that Dr. Wecht's testimony "may have resulted in [a] different judgment at the original trial."

## STANDARD OF REVIEW

Petitioner contends that the trial court erred by placing too great a burden on him in order to secure coram nobis relief. Specifically, petitioner contends the trial court disregarded the statutory requirement which simply provides that the newly discovered evidence "may have resulted in a different judgment," *see* Tenn. Code Ann. § 40-26-105, and erroneously required the petitioner to conclusively establish that the newly discovered evidence would have resulted in a different judgment. Although we agree that some of the language used in the order suggests an inappropriate standard of review in this state, it is apparent that the petitioner is not entitled to relief based upon the actual findings of the trial court.

The trial court in its order noted varying standards as to when coram nobis relief is available, including: when the record discloses errors of fact of such "fundamental character" as to render the proceeding irregular and invalid, or to compel action to achieve justice; when the question is of such a vital nature that the new facts "conclusively" would have prevented rendition of the judgment; when the petitioner establishes by a "reasonable probability" that the newly discovered facts would change the result of the trial; when the petitioner establishes that the result of the trial would "likely be changed" if the new evidence had been admitted; when the newly discovered evidence is of a "conclusive character" such that there is a "strong probability" of a miscarriage of justice; and when the trial court is "reasonably well-satisfied" that the jury would reach a different conclusion. However, the trial court also specifically reiterated on several occasions the statutory standard of "may have resulted in a different judgment." *See* Tenn. Code Ann. § 40-26-105. We conclude that some, but not all, of the terminology used by the trial court suggests a higher burden of proof than contemplated by the statute.

## A. "Reasonable Probability" Standard

As the *Amicus Curiae* notes, there do not appear to be any Tennessee cases which explicitly analyze the "may have resulted in a different judgment" language in the coram nobis statute. However, our state supreme court has noted that coram nobis relief can be granted on the basis of newly discovered recantation testimony only if the trial court is "reasonably well-satisfied" that the recanted testimony is truthful and the trial testimony was false, and "the jury might have reached a different conclusion had the truth been told." State v. Mixon, 983 S.W.2d 661, 673 n.17 (Tenn. 1999). We also note that the remand from the state supreme court in the case at bar specifically referred to this standard. Workman, 41 S.W.3d at 104.

It is arguable that the "may have resulted in a different judgment" language should be viewed under the same standard as a motion for new trial based upon newly discovered evidence. The test in such a situation is whether the newly discovered evidence "will likely change the result of the trial." State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994). However, this appears on its face to be a higher standard than the "may have" language in the statute and the "might have" language used by our supreme court in Mixon. Furthermore, a lesser standard would appear to be more appropriate, especially where alleged exculpatory evidence was not turned over to the defense. When exculpatory evidence is not turned over to the defense, the test is whether there is a "reasonable probability" that the result of the proceeding would have been different. United States

v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995). Our criminal courts are accustomed to this standard as the same standard is used in post-conviction cases involving ineffective assistance of counsel. *See* Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

Accordingly, we agree with the *Amicus Curiae* and conclude that the "reasonable probability" standard is the proper interpretation of the "may have resulted in a different judgment" language used in Tennessee Code Annotated section 40-26-105.

## B.    Appellate Court's Standard of Review

Coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." Mixon, 983 S.W.2d at 672. The decision to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. Teague v. State, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988), *overruled on other grounds*, Mixon, 983 S.W.2d at 671 n.13. Thus, this court will not overturn the decision of the trial court absent an abuse of the trial court's discretion.

## ANALYSIS - RECANTATION TESTIMONY

We must now determine whether the trial court erred in failing to grant coram nobis relief based upon the alleged recantation testimony of Harold Davis. Although the trial court mentioned varying standards of review in the order, the trial court specifically stated that it "is not satisfied that the defendant has demonstrated that the current statements of Davis may have caused the jury to reach a different conclusion." The trial court further expressly found that "Davis's current contradictory statements would have little if any impact upon the jury's consideration of Davis's original testimony." In fact, the trial court did not consider the befuddled testimony given by Davis to be a recantation. Based upon our review of his testimony, we find it difficult to conclude otherwise.

The trial court further found that Vivian Porter's testimony at the coram nobis hearing, which was to be corroborative of Davis's testimony, was contradictory to the testimony of Davis, who said he was not with Porter on the night of the homicide. The trial court determined her testimony should be given little weight. The trial court was in a much better position than this court to evaluate the credibility of the witnesses who appeared before it. From our review of the record, we are unable to conclude that the trial court abused its discretion in denying relief on the basis of the coram nobis testimony of Davis and Porter.

Although the trial court did not address the stipulated photograph, it is apparent the trial court considered it insignificant. We, likewise, fail to see the crucial significance of a photograph that reveals Davis's car was not on the parking lot *thirty minutes* after the homicide.

It is apparent to this court that the trial court's actual findings clearly indicate that it found no reasonable probability that the coram nobis testimony of Davis and Porter and the photograph of the parking lot would have affected the verdict. The trial court did not abuse its discretion in denying relief on the basis of recanted testimony. This issue is without merit.

## ANALYSIS - NEWLY DISCOVERED X-RAY EVIDENCE

We must now analyze the effect, if any, of the newly discovered x-ray. We agree with the trial court that most of the testimony by Dr. Wecht related to evidence that was available to the petitioner prior to trial. The vast majority of his testimony was, in fact, based upon evidence recovered at the crime scene and the autopsy report, all of which was available prior to trial. The only recently discovered evidence was the x-ray, which in Dr. Wecht's opinion was merely corroborative of his previously formed opinion. Coram nobis relief is available only for "matters that were not or could not have been litigated on the trial of the case" and for "newly discovered evidence" provided "the defendant was without fault in failing to present certain evidence at the proper time." Tenn. Code Ann. § 40-26-105.

Again, despite the mention of varying standards of review in the order, the trial court specifically found that (1) "the defendant has failed to demonstrate that a different judgment may have resulted had the jury been presented with Dr. Wecht's opinions;" and (2) it "cannot reasonably conclude" Dr. Wecht's testimony "may have resulted in a different judgment." In doing so, the trial court noted the petitioner admittedly possessed a .45 caliber weapon and Officers Stoddard and Oliver possessed .38 caliber weapons.[2] The trial court also noted that both Officers Stoddard and Parker testified they did not fire their weapons at the time the victim was shot. Furthermore, the proof at trial indicated the victim fired multiple rounds from his revolver shortly after being shot. Petitioner's weapon was found in the open position, and a live round was found at the crime scene. The trial court also noted petitioner's testimony in his original trial in which he conceded he fired his weapon, "and I guess it was pointed at the officers."

The trial court also noted Dr. Wecht's testimony did not exclude the possibility of a .45 caliber hollow point bullet causing the fatal wound, and that even a .38 caliber hollow point bullet would typically expand upon impact with the human body. The trial court further noted that Dr. Wecht's testimony was similar to the testimony given by FBI Agent Wilkes at the original trial in that both would have expected to see more deformation if the recovered bullet were, in fact, the bullet that struck the victim. The trial court also observed that the bullet found at the crime scene may not have been responsible for the victim's death; yet, the fatal shot may still have come from the petitioner's weapon.

---

[2]There appears to be some confusion as to the weapon possessed by Officer Parker. Our review of his original trial testimony indicates that he had his service revolver in his possession when he first encountered the petitioner. Subsequently, he secured a shotgun from another officer.

Petitioner contends in his brief that it was the state's theory at trial that this recovered bullet was, in fact, the bullet that killed the victim. We have examined the reference to the transcript made by the petitioner and do not necessarily reach this conclusion. We have also examined the opening statement made by the state, which arguably might indicate the fatal bullet would be produced at trial. However, we also note the testimony of state witness FBI Agent Wilkes appeared to question whether the fatal bullet would be as intact as the recovered bullet. In closing argument, defense counsel argued that the state had failed to prove that the recovered bullet was the bullet that killed the victim. In response to this argument, the state in rebuttal argued as follows:

> [Defense counsel] said we were going to show you the bullet. I think you've heard the doctor's testimony- -excuse me, not the doctor, but the FBI man from the laboratory in Washington. He said the bullet was perfectly consistent, Exhibit 35, with going through the arm of Officer Stoddard. That's what that slug was.

In conclusion, the trial court found that "considering that the jury heard similar proof at the original trial; the strength of the evidence presented at the original trial; and the inconclusiveness of Dr. Wecht's testimony, this court cannot reasonably assume that the admissibility of the evidence solicited by Dr. Wecht's testimony may have resulted in [a] different judgment at the original trial."

In spite of the trial court's use of terminology in some portions of the order which might indicate an inappropriate standard of review, we see no reason to remand in light of the overall findings of the trial court. The trial court expressly stated that it "cannot reasonably conclude" that Dr. Wecht's testimony "may have resulted in a different judgment." Furthermore, the crucial inquiry is whether there is a reasonable probability of a different judgment based upon Dr. Wecht's testimony concerning the x-ray, which was the newly discovered evidence. The trial court's findings clearly indicate that it would not. Again, the trial court was in a much better position than this court to judge the credibility of this testimony. We find no abuse of discretion in denying the writ on this basis.

## FORMER JUROR'S PROPOSED TESTIMONY

As a part of the petitioner's proof at the coram nobis hearing, he proposed to present the testimony of a juror in the original trial. The trial court disallowed the testimony, but allowed the petitioner to make an offer of proof. The juror testified she had seen Harold Davis's testimony at the coram nobis hearing, was aware of Vivian Porter's testimony, and reviewed Dr. Wecht's testimony at petitioner's clemency hearing. The juror indicated her verdict would have been different had she known about this other information at the time of trial.

Tennessee Rule of Evidence 606(b) expressly prohibits a juror from testifying "as to any matter or statement occurring during the course of the jury's deliberations *or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict* . . . ." (Emphasis added). Our state supreme court has concluded that a juror's affidavit in a post-conviction case as to the effect on the jury verdict of a witness's failure to testify was prohibited by

Rule 606(b). <u>Henley v. State</u>, 960 S.W.2d 572, 580-81 (Tenn. 1997). We see no significant distinction between that post-conviction case and this coram nobis proceeding as it would relate to Rule 606(b). Accordingly, the trial court correctly determined that Rule 606(b) prohibits this testimony, which in our view is speculative at best. Furthermore, we do not envision a due process violation as argued by the petitioner.

## PROPORTIONALITY REVIEW

Neither the petitioner nor the state raises the issue as to whether this court should at this point conduct a proportionality review. However, the *Amicus Curiae* contends it is our responsibility to do so. *See generally,* Tenn. Code Ann. § 39-13-206(c)(1)(D); <u>State v. Godsey</u>, 60 S.W.3d 759, 781 (Tenn. 2001).

Although our state supreme court did not conduct the type of proportionality review contemplated by <u>State v. Bland</u>, 958 S.W.2d 651, 667 (Tenn. 1997), the court in its 1984 opinion in the direct appeal did hold that "the sentence of death under the circumstances of this case is in no way arbitrary or disproportionate." <u>Workman</u>, 667 S.W.2d at 46. We are unaware of any authority requiring further proportionality review upon the denial of coram nobis relief. Accordingly, we decline to conduct any further proportionality review.

## CONCLUSION

Petitioner was convicted twenty years ago of first degree murder in perpetration of robbery based upon what our state supreme court described as "overwhelming evidence of defendant's guilt." <u>Workman</u>, 667 S.W.2d at 49. Petitioner's memory is admittedly clouded. He testified at trial he was a drug addict and had injected cocaine into his veins and taken "speed pills" prior to the offense and was strongly under the influence of cocaine and pills at the time of the offense. He testified at trial that, because of his drug-induced condition, he had no recollection of numerous things that he said and did at the time of the robbery, yet conceded he must have done them. He admitted firing his weapon and subsequently throwing it "in the bushes." It was subsequently found in the open position with no more ammunition in it.

Our review of the final argument in his 1982 trial reveals the petitioner's primary argument was that he was so under the influence of drugs that he was unable to form premeditation or the requisite intent to commit robbery. Defense counsel, therefore, argued: "Then the law presumes if you find that Philip Workman is responsible, the law presumes that it is murder in the second degree . . . . I submit to you that the proof here does not raise this to murder in the first degree." In light of the evidence, including the petitioner's damning testimony, this was certainly a reasonable trial strategy.

The question before this court, some twenty years after this tragedy, is whether there is a "reasonable probability" that the alleged recantation testimony and/or the newly discovered x-ray would change the result of the trial. The trial court found that the alleged recantation testimony and

testimony concerning the x-ray did not reasonably establish that a different judgment "may have resulted."  We conclude the trial court did not abuse its discretion in making this determination.

The judgment of the trial court is affirmed.


_____
JOE G. RILEY, JUDGE