IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 15, 2010

## JAMES A. BURGESS v STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Putnam County**
**No. 07-0676     David A. Patterson, Judge**

_____

**No. M2010-01517-CCA-R3-CO - Filed January 20, 2011**

_____

A Putnam County jury convicted the Petitioner, James A. Burgess, of two counts of second degree murder, two counts of felony murder, especially aggravated burglary, and felony reckless endangerment and sentenced the Petitioner to life imprisonment for each of the felony murder convictions. The Petitioner appealed the convictions, and this Court remanded the case for modification of the Petitioner's conviction for especially aggravated burglary to aggravated burglary and affirmed in all other respects. *State v. Burgess*, M2009-00897-CCA-R3-CD, 2010 WL 3025524 (Tenn. Crim. Ct. Aug 4, 2010). In May 2010, the Petitioner filed a petition for a writ of error coram nobis, in which he alleged the existence of newly discovered evidence. The trial court dismissed the petition, finding that the Petitioner failed to raise the existence of newly discovered evidence. On appeal, the Petitioner contends the trial court's denial was in error. After a thorough review of the record and applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, delivered the opinion of the Court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

James A. Burgess, Pikeville, Tennessee, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Randall A. York, District Attorney General; and Anthony Craighead, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Background**

In our opinion on the Petitioner's direct appeal, this Court summarized the underlying facts as follows:

> [The Petitioner] and the victim, Elizabeth Burgess, began dating in 1998. At the time, the victim was already pregnant with her first child, M.C. [The Petitioner] was with the victim when M.C. was born, and [the Petitioner] took an active role in raising the child. On June 30, 2000, [the Petitioner] and the victim got married. On December 17, 2002, J.B., the son of the victim and [the Petitioner], was born. Shortly after the birth of J.B., the marriage began to deteriorate.
>
> By January 2007, the marriage was beyond repair. According to [the Petitioner], the victim told him at that time that she was unhappy with him and unhappy in the marriage. [The Petitioner] began sleeping at the ambulance station where he worked as a paramedic. By March 2007, he was living at a friend's house. During this time period, [the Petitioner] began dating a woman named Jackie Reid, and the victim began dating a man named Jimmy Prewitt, the other victim.
>
> On February 22, 2007, the chancery court entered an order which ordered [the Petitioner] to have no contact with the victim. [The Petitioner] testified that he was not present when the court ruled on the order of protection. He admitted that he signed it at a later time. On March 26, 2007, the chancery court entered an ex parte order of protection in which [the Petitioner] was ordered to have no contact or communication with the victim. The order also set a hearing for April 5, 2007. On April 5, 2007, the court entered an order continuing the matter until a hearing on April 20, 2007, and extending the ex parte order of protection.
>
> [The Petitioner] had visitation with J.B. on May 1 and May 3, 2007. On May 5, 2007, according to [the Petitioner], the victim sent him a text message that she needed child support money. On the evening of May 5, 2007, [the Petitioner] sent the victim several text messages to try to get her to talk to him about J.B. and whether Mr. Prewitt was spending the night at the house. The victim sent a reply that she was eating supper and refused to talk to [the Petitioner] at that time. She told him to send her a text message or leave a voice mail instead. [The Petitioner] found the victim, Mr. Prewitt, and the children, M.C. and J.B., at Cheddar's restaurant. [The Petitioner] approached them in the parking lot. Words were exchanged between [the Petitioner], the victim, and Mr. Prewitt. The victim drove off with Mr. Prewitt and the children. [The Petitioner] was angry and sat in his car.

Shortly thereafter, [the Petitioner] began driving to the victim's home which he formerly shared with her. As he drove to the house, he called Ms. Reid and told her that he could not "take this anymore," and he was going to "kill her," meaning the victim. Ms. Reid testified that he might have said "kill them" instead of "kill her." When [the Petitioner] arrived at the house, the victim and Mr. Prewitt were outside on the front porch. The victim said that she did not want to talk to him and the victim and Mr. Prewitt went inside the house. [The Petitioner] walked to his car and pulled out a gun from his duffle bag. According to [the Petitioner], he was attending a picnic later that day and intended to do some target practice with a friend. [The Petitioner] loaded two magazines with ammunition. He placed one magazine in the gun. [The Petitioner] walked to the front door. He could see M.C. and J.B. in M.C.'s room through the window which is right next to the front door. [The Petitioner] knocked on the door. When the victim and Mr. Prewitt did not open the door, [the Petitioner] fired into the front door six times. Using the gun, he broke a side window next to the door. [The Petitioner] reached through the broken window and unlocked the door. [the Petitioner] walked into the living room and shot the victim nine times.

[The Petitioner] followed Mr. Prewitt into M.C.'s room. The children were standing in front of the raised window. [The Petitioner] had told them long ago to crawl out of the window and get out of the house when the alarm was set off. Mr. Prewitt ran to the window with the children and pushed the children behind him. [The Petitioner] entered the room about where the children were standing and began shooting Mr. Prewitt. Mr. Prewitt climbed out of the window, and [the Petitioner] followed him. Mr. Prewitt was shot five times and one of the wounds was at his left temple. The shot to Mr. Prewitt's temple had been fired from two and a half to three feet away.

According to [the Petitioner], after shooting the victim and Mr. Prewitt, his first thoughts were of the children. He went inside the house to make sure they were okay. He hugged and kissed them. He went to the living room and saw the victim's body. He knew that she was dead. He held her hand and told her that he loved her. [The Petitioner] disconnected the house alarm and called 911. He told the operator that he had killed the victim because he hated her and she hated him. When the 911 operator asked if the victim was dead, [the Petitioner] replied that he hoped so.

[The Petitioner] sat on the front porch of the house and considered committing suicide. However, a friend called his cellphone and talked [the

Petitioner] out of it. While [the Petitioner] sat on the front porch, local law enforcement surrounded the house and set up a perimeter with a SWAT team. Local law enforcement had been informed that [the Petitioner] was armed by the 911 operator. After about three hours, the officers were able to approach [the Petitioner] and arrest him. The children were in the house until [the Petitioner] was arrested.

When the officers approached the house, they saw a dead man in the front yard. Upon entering the house, they saw a body in the living room and a great deal of blood. The officers retrieved the children from the bedroom and stood in a line in front of the victim's body, so the children would not have to see their mother's body.

Two days later, on May 7, 2007, the court filed its order stemming from the hearing on April 20 regarding child support and visitation. This ordered modified the order of protection to state that the only contact between the parties would be to set visitation. The order set out [the Petitioner] would have visitation with J.B. two days a week. In addition, the order stated that the first child support payment should be made on May 1, 2007.

On November 5, 2007, the Putnam County Grand Jury indicted [the Petitioner] for two counts of first degree murder, two counts of felony murder, one count of especially aggravated burglary, and one count of reckless endangerment. On January 21 and 22, 2009, the trial court held a jury trial. At the conclusion of trial, the jury convicted [the Petitioner] of two counts of second degree murder, two counts of felony murder, one count of especially aggravated burglary, and one count of reckless endangerment. The jury determined that [the Petitioner] should be sentenced to life in prison for the two felony murder convictions.

*State v. James Anthony Burgess*, No. M2009-00897-CCA-R3-CD, 2010 WL 3025524, at *1-2 (Tenn. Crim. App., at Nashville, Aug. 4, 2010), *perm. app. not filed*.

On May 5, 2010, the Petitioner filed a petition for a writ of error coram nobis. The petition alleged the existence of newly discovered evidence on the basis that the "evidence was not presented by the defense at trial due to the defense attorney refusing to argue the burglary issues at trial." This evidence consisted of a Warranty Deed dated July 14, 2003, indicating the property owners for the home where the Petitioner killed the victims as the Petitioner and his estranged wife, Elizabeth Ann Burgess. The Petitioner also submitted evidence of the ex parte order of protection entered against him. The Petitioner asserts that his felony murder

-4-

conviction, based upon burglary, is not supported by the evidence in light of his ownership of the property and the fact that he was not subject to a "valid order of protection" at the time of these offenses. T.C.A § 29-14-401(3).

The State responded to the petition for a writ of error coram nobis, requesting that the petition be dismissed because the petition did not raise any allegations of newly discovered evidence. The trial court issued an order denying the Petitioner's petition for a writ of error coram nobis because the petition was "merely a recitation of what the defendant alleges are trial errors" and contained no allegations of newly discovered evidence. It is from this judgment the Petitioner now appeals.

## II. Analysis

A writ of error coram nobis is available to a defendant in a criminal prosecution. T.C.A. § 40-26-105(a) (2006). The decision to grant or to deny a petition for the writ of error coram nobis on its merits rests within the sound discretion of the trial court. *State v. Harris*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999); *State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). As previously noted by our Court, "the purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1996)).

A petition for a writ of error coram nobis should state: (a) the grounds and the nature of the newly discovered evidence; (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial; (c) that the Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (d) the relief sought. *Hart*, 911 S.W.2d at 374-75. Affidavits should be filed in support of the petition or at some point in time prior to the hearing. *Id.* at 375.

The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

*Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003).

We agree with the trial court that the evidence showing the Petitioner's ownership of the home where he killed the victims and evidence of the ex parte order do not constitute newly discovered evidence. Although the Petitioner may be correct that the jury did not see the documentation of his home ownership, the Petitioner was aware of his ownership interest in the house at the time of his January 2009 trial, and, therefore, could have presented this evidence to the jury.

Additionally, the Petitioner was also aware of the ex parte order against him at the time of trial. The Defendant does not contend that he did not have knowledge of his ownership of the house or of the ex parte order of protection. Rather, he claims that he should be granted relief because the defense attorney did not present certain documentary evidence of these facts to the jury. Thus, we conclude that the trial court did not err in denying the Petitioner's writ of error coram nobis. We would also note that, on direct appeal, this Court thoroughly addressed the Petitioner's claim that he was not excluded as an "owner" of the home under the burglary statute. *See State v. James Anthony Burgess*, No. M2009-00897-CCA-R3-CD, 2010 WL 3025524 (Tenn. Crim. App., at Nashville, Aug. 4, 2010), *no Tenn. R. App. P. 11 application filed*. The Defendant is not entitled to relief.

### III. Conclusion

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE