IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 18, 2018

## RHYUNIA LAMONT BARNES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 97-D-2542      Steve R. Dozier, Judge**

_____

**No. M2017-02033-CCA-R3-ECN**

_____


The Petitioner, Rhyunia Lamont Barnes[1], was convicted of first degree murder and sentenced to life.  In his appeal, the Petitioner argues that the trial court erred in summarily dismissing his petition for writ of error coram nobis.  Upon review, we affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Rhyunia Lamont Barnes, Pikeville, Tennessee, pro se.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Glenn Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Petitioner was indicted in 1997 for the first degree murder of De'Shon Martin. Following a jury trial in 1999, he was convicted as charged and sentenced to life in prison.  He appealed his sentence to this court, and we affirmed the trial court's judgment.  State v. Rhynuia Lamont Barnes, No. M2001-00631-CCA-R3-CD, 2002 WL 1358717, at *1 (Tenn. Crim. App. June 24, 2002), perm. app. denied (Tenn. Dec. 2, 2002).  This court summarized the facts on direct appeal as follows:

_____

[1] Past opinions from this court referenced in this opinion spell the Petitioner's name as Rhynuia Lamont Barnes.  However, all documents contained in this appellate record including the Petitioner's own briefs refer to the Petitioner as Rhyunia Lamont Barnes.

Joyce Martin testified she lived with her two sons, 24 year-old Da'Shon Martin, the victim, and 19 year-old Carlton Martin. She stated that on September 2, 1997, at approximately 2:00 p.m., Tom Morrell, a neighbor, came to her door and asked if the victim were home. Martin responded the victim was sleeping in his room, and Morrell walked toward his room and told the victim someone wanted to see him. Morrell then walked out of the residence and returned to his home. Martin stated she looked outside her house and saw the [Petitioner], whom she had never met, standing at her gate. The victim exited the residence, stood on the porch, and inquired what the [Petitioner] wanted. Martin said she next saw the [Petitioner] brandish a pistol, at which time the victim ran back inside the house. The [Petitioner] then said, "Your son stole my jewelry, and I'm going to kill him;" the victim ran to the back of the house; and the [Petitioner] ran to her backyard with his gun in his hand. Martin explained her back door was secured by a deadbolt key lock which required a key to open.

Martin further testified she phoned 911 while the victim was hiding in the back of the residence, and the [Petitioner] was in the backyard. The [Petitioner] then ran back inside her front door holding his gun. The [Petitioner] then said twice that he would shoot the victim's mother if the victim did not come out of hiding. At that point, the [Petitioner] ran toward the bathroom at the rear of the house, and another man, later identified as James Barnes, the [Petitioner's] father, entered the residence and inquired about his son. Martin told James Barnes the [Petitioner] went to the rear of the house. Martin testified she then heard one shot and fled from the residence to a neighbor's home. Martin identified the murder weapon as the gun she saw in the [Petitioner's] hand.

Tommy Morrell, a neighbor, testified that on September 2nd, the [Petitioner] arrived at approximately 3:00 p.m. riding in the front seat of a vehicle driven by an older man. Morrell testified the [Petitioner] requested he get the victim. Morrell further stated he went inside the victim's house and told the victim "two guys" wanted to see him, and Morrell exited the house. When Morrell reached the front gate, he saw the victim step onto the porch. Morrell later saw the [Petitioner] go inside the gate. Morrell further stated the older man was seated in the car.

Morrell explained he knew "something [was] going down," so he went back to his house and instructed his mother to stay inside. Morrell stated the older man exited the car; the [Petitioner] first ran in the house but then exited the house telling the older man that "[the victim] might have gone

out the backdoor;" the [Petitioner] ran around one side of the house, while the older man ran around the other; the [Petitioner] ran back around to the front of the house and entered it brandishing a gun; the older man entered the house; and he heard a gunshot. Morrell stated he never saw the older man with a gun. On cross-examination, Morrell denied receiving drugs as compensation for summoning the victim outdoors.

Metro Police Officer Jerry Bottom testified he arrived on the scene within one minute of receiving the dispatch and saw the [Petitioner] running across the street holding his waistband. Officer Bottom stated his first priority was the victim, and since a second cruiser had arrived, he entered the victim's residence through the open front door and found the wounded victim on the floor. Officer Bottom stated he saw a man standing by a parked car when he initially arrived; he was unsure if the [Petitioner] ran from inside the home; and the interior of the home exhibited no signs of a struggle.

Metro Police Officer Marshall James Brown testified he and his partner, Officer Chris Locke, arrived at the scene immediately after Officer Bottom. Officer Brown stated that while he and Officer Locke were walking toward the residence, the [Petitioner] ran from across the street and dove head first into the backseat of a parked car. He additionally stated James Barnes walked toward the vehicle's driver's side. He and Locke then detained them, and Joyce Martin identified them as the persons in her home. On cross-examination, Officer Brown stated James Barnes was bleeding from a cut on his hand.

Officer Chris Locke corroborated Officer Brown's testimony. He further testified the [Petitioner] made remarks after being arrested; he activated his pocket audio recorder to record the [Petitioner]; and he made notes during the [Petitioner's] outbursts. He testified the [Petitioner], while being handcuffed, stated that the victim should not break in his house and steal his jewelry. At that point, Officer Locke placed the [Petitioner] in the rear seat of the cruiser, activated his pocket audio recorder, and sat in the driver's seat for approximately one hour and fifteen minutes. Officer Locke also wrote down the [Petitioner's] statements verbatim. Officer Locke testified from his written notes, which indicated the [Petitioner] said:

> I went in the house with him; I didn't shoot him; I threw my dope in the alley; that's why I ran. I ain't did nothing. I ain't got no gun; what [are] you detaining me for . . . . He needed

- 3 -

to quit lying on me. He finded [sic] no gun on me. Why am I being detained? I ran and dumped my dope and came back . . . No gun, no motive. I ain't got no lie to tell. I dumped my dope. He stole my jewelry.

At that point, other officers found a gun in the [Petitioner's] line of sight, and the [Petitioner] said, "Man, ain't found no gun on me. Man, how do you know it was me; that could have been anybody's. Whose gun? I know my lawyer will get me off. I got money; I got big money. Take me down so I can make bond." The [Petitioner] also stated, "Man, he steals $4,000 worth of jewelry and I'm supposed to let it ride. F* *k that s* *t, man."

Metro Police Investigator David Elmore testified he searched the area and found a gun hidden inside a plastic bag of clothing in a pile of garbage across the street from the victim's residence.

Metro Police Officer Charles Ray "Friday" Blackwood testified he searched the victim's residence and was unable to find a weapon; he recovered three live .38 shells from James Barnes' pocket; and the .38 revolver found in the garbage had five spent casings in its chambers.

Medical Examiner Dr. Bruce Levy testified the victim died as a result of three gunshot wounds fired from a distance of "greater than 18 to 24 inches" from the victim's body. Although Dr. Levy stated the victim had small abrasions on his chin, arm, back, and abdomen, he opined they were not the result of a struggle.

Danny Morris, a specialist in latent fingerprint analysis with the Metro Police Identification Division, testified a palm print was recovered from the weapon that did not match the [Petitioner's] print. Morris explained, however, this evidence did not definitively establish that the [Petitioner] never handled the gun since there are numerous reasons why one could touch a surface and not leave a latent print.

Metro Police Detective Kent McAlister testified he searched the crime scene and was unable to find a gun or spent shell casings. Det. McAlister stated although the [Petitioner] and James Barnes were initially both suspects, the charges against James Barnes were dropped at his preliminary hearing. He explained James Barnes was not initially fingerprinted because his hand was bandaged, and after the charges were dropped, it became impossible to obtain his prints.

Metro Police Detective Jeff West testified he assisted in interviewing the [Petitioner] at the police station. He testified that although he could not recall if the [Petitioner] and James Barnes were seated together while awaiting questioning, it was unlikely because standard procedure dictates they be separated. Det. West testified the [Petitioner] confessed to the crime and told him to release James Barnes because he had "nothing to do with it" and had tried to stop him from going into the Martin residence with his gun.

TBI firearms expert Steve Scott testified the shell casings and bullet fragments submitted for analysis were fired from the .38 revolver. Scott conceded the gun was not tested for the presence of blood or tissue, and it was possible for a person's hand to become injured if caught between the weapon's hammer and firing pin.

The [Petitioner] testified when he got in the car with his father, James Barnes, on September 2nd, he did so with the intention of receiving a ride to visit his son. The [Petitioner] stated his father requested the [Petitioner] direct him to the [Petitioner's] drug supplier, a person by the name of "Ricko," which the [Petitioner] did. After their arrival, James Barnes asked Ricko the location of his stolen jewelry, and they drove to the victim's residence to replevy the jewelry. The [Petitioner] stated his father parked his vehicle on the street near the victim's residence, handed the [Petitioner] the revolver, and told the [Petitioner] to place it in his pocket. The [Petitioner] testified the gun remained in his shorts until he handed it back to James Barnes. He stated that, under the instruction of James Barnes, he gave Tommy Morrell drugs to summon the victim outside.

The [Petitioner] further testified he and James Barnes walked toward the residence, and the victim exited onto the porch. When the [Petitioner] inquired, "where [is] the jewelry," the victim ran back inside the home. The [Petitioner] stated he then stepped in the front room of the house, and the victim's mother told him to "get out;" he exited and ran around the side of the house, attempting entry through the back door; and since the door was locked, he returned to the front of the house where he handed James Barnes the gun. The [Petitioner] said he "[g]ave [James Barnes] the gun back [and] started out [of] the yard . . . thinking he's coming behind me . . . thinking it's over."

The [Petitioner] further stated once he arrived at the car, he realized his father had not followed him, so he reentered the residence, went to the rear

of the home, and saw the victim run to the bathroom. He then attempted to open the bathroom door, which was either locked or being held, and as he started to leave the home again, James Barnes fired a shot through the bathroom door. After the shot was fired, the victim exited the bathroom and struggled for the gun with James Barnes. The [Petitioner] stated that after a brief struggle, James Barnes fired shots, handed the [Petitioner] the gun, and they exited the home. The [Petitioner] stated he then ran across the street and discarded his "eighty-ball" of "dope" and the gun. He stated that he ran back to the car because he thought he left his beeper in the car and then dove into the car.

The [Petitioner] stated he had no intention of killing the victim, and after he was arrested, he made admissions to Officer Locke because

> in [his] neighborhood, it's like, you try to make the police as mad as you can by being as smooth as you can with them. You just smart off to them, just try to smart off to them, make them mad cause like−that's all I was doing was really just mouthing off.

The [Petitioner] further testified he was seated next to his father at police headquarters, and his father intimidated him, so he confessed to the crime. The [Petitioner] explained he was fearful of his father, and his father had always said "the worst thing you can be is a snitch."

The [Petitioner] further testified he "probably" threatened to shoot the victim's mother, but did so to try to scare her out of the house so "no more innocent bystanders [would get] hurt;" he got blood on his shorts while attempting to protect the victim by trying to separate James Barnes from him; and James Barnes wiped the gun clean prior to giving it to him. The [Petitioner] further admitted he had contact with James Barnes while awaiting trial on bond, and he conceded he said he was on bond because of the person he killed, but explained it was just "everyday neighborhood talk."

Saunte Lewis Young, the [Petitioner's] sister, testified the [Petitioner] never owned jewelry; James Barnes wore jewelry; James Barnes had previously "cut" the [Petitioner]; and they had previously shot at each other. Sandra Barnes, the [Petitioner's] mother, testified the [Petitioner] and James Barnes had a bad relationship, but she had requested the [Petitioner] try to get along with him.

- 6 -

Rhynuia Lamont Barnes, 2002 WL 1358717, at *1-4.

In 2003, the Petitioner filed a petition for post-conviction relief arguing ineffective assistance of counsel and a violation of his rights under the Confrontation Clause. This court affirmed the trial court's denial of relief. Rhynuia L. Barnes v. State, No. M2004-01557-CCA-R3-PC, 2005 WL 2139408, at *1 (Tenn. Crim. App. Sept. 2, 2005), perm. app. denied (Tenn. Feb. 6, 2006). In 2009, the Petitioner filed his first petition for writ of error coram nobis alleging that a letter, written by his late father confessing to the murder, was newly discovered evidence. This court affirmed the coram nobis court's summary dismissal of the petition as time-barred. Rhynuia L. Barnes v. State, No. M2010-01554-CCA-R3-CO, 2011 WL 6322500, at *1 (Tenn. Crim. App. Oct. 27, 2011), perm. app. denied (Tenn. Mar. 7, 2012). In 2015, the Petitioner filed a second petition for writ of error coram nobis, alleging newly discovered evidence in the form of an ATF report that exonerated him as well as some emails between his attorney and the prosecutor that indicated his innocence. Again, this court affirmed the coram nobis court's summary dismissal of the petition as time-barred. Rhyunia Lamont Barnes v. State, No. M2015-01061-CCA-R3-ECN, 2016 WL 537127, at *1 (Tenn. Crim. App. Feb. 10, 2016), no perm. app. filed.

On July 12, 2017, the Petitioner filed his third petition for writ of error coram nobis alleging newly discovered evidence, which is the subject of this appeal. The Petitioner alleged that an affidavit of his ex-girlfriend, Rebecca C. Castor, proved his actual innocence. The affidavit stated, "[Castor] heard . . . [the Petitioner's] father . . . tell [the Petitioner's] mother . . . in September of 1997 that [the Petitioner] did not do the shooting." [The Petitioner's father] said he was the one who shot the [victim] in his mother's house." Without a hearing, the coram nobis court denied the petition as time-barred and held that the Petitioner was not entitled to due process tolling based on the overwhelming evidence of guilt presented at trial and the fact that the Petitioner already had the opportunity to argue his theory, that his father committed the murder, at trial. It is from that judgment that the Petitioner now timely appeals.

## ANALYSIS

In his petition for writ of error coram nobis, the Petitioner argues that the coram nobis court erred in summarily dismissing his petition because Castor's sworn affidavit constitutes newly discovered evidence. He argues that the petition is not time-barred because the affidavit proves his actual innocence. Further, he contends that the coram nobis court was premature in its denial because the State did not respond to the petition raising the statute of limitations as an affirmative defense. The State contends, and we agree, that the coram nobis court properly dismissed the petition.

A writ of error coram nobis is an "extraordinary procedural remedy" that "fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn.1999) (citing Penn v. State, 670 S.W.2d 426, 428 (Ark. 1984)); State v. Workman, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002); see also T.C.A. § 40-26105(a) (2006). "The purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting State ex rel. Carlson v. State, 407 S.W.2d 165, 167 (Tenn. 1966)).

Relief by petition for writ of error coram nobis is provided for in Tennessee Code Annotated section 40-26-105. The statute provides, in pertinent part:

> (b) The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

T.C.A. § 40-26-105(b) (Supp. 2009). A petition for writ of error coram nobis must contain the following: "(1) the grounds and the nature of the newly discovered evidence; (2) why the admissibility of the newly discovered evidence may have resulted in a different judgment had the evidence been admitted at the previous trial; (3) the petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (4) the relief sought by the petitioner." Freshwater v. State, 160 S.W.3d 548, 553 (Tenn. Crim. App. 2004) (citing Hart, 911 S.W.2d at 374-75).

The statute of limitations for a petition for writ of error coram nobis is one year from the date the judgment becomes final in the trial court. T.C.A. § 27-7-103; Mixon, 983 S.W.2d at 671. For the purposes of a coram nobis petition, a judgment becomes final thirty days after the entry of the trial court's judgment if no post-trial motions are filed or upon entry of an order disposing of a timely post-trial motion. Mixon, 983 S.W.2d at 670 (citing Tenn. R. App. P. 4(c); State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996)). However, "when a petitioner seeks a writ of error coram nobis based on newly discovered evidence of actual innocence, due process considerations may require tolling of the statute of limitations." Harris v. State, 301 S.W.3d 141, 145 (Tenn. 2010). "[B]efore a state may terminate a claim for failure to comply with procedural

requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992).

The State has the burden of raising the statute of limitations bar as an affirmative defense in a coram nobis proceeding. Harris, 301 S.W.3d at 144 (citing Harris v. State, 102 S.W.3d 587, 593 (Tenn. 2003)). Whether a claim is barred by the statute of limitations is a question of law, which this court reviews de novo. Id. (citing Brown v. Erachem Comilog, Inc., 231 S.W.3d 918, 921 (Tenn. 2007)). This court has stated that "the statute of limitations is an affirmative defense which must be specifically pled or it is deemed waived." Newsome v. State, 995 S.W.2d 129, 133 n.5 (Tenn. Crim. App. 1998). This court has affirmed a coram nobis court's summary dismissal of a petition for writ of error coram nobis when the dismissal occurred before the State responded and asserted a statute of limitations defense when the petition had been filed after the statute of limitations had tolled. See Antoinette Hill v. State, No. E2013-00407-CCA-R3-PC, 2013 WL 5634108, at *3 (Tenn. Crim. App. Oct. 16, 2013), perm. app. denied (Tenn. Apr. 8, 2014) (citing State v. Johnny L. McGowan, Jr., No. M2007-02681-CCA-R3-CO, 2008 WL 4170273 (Tenn. Crim. App. Aug. 5, 2008)).

In the present case, it does not appear from the record that the State raised the statute of limitations as an affirmative defense prior to the coram nobis court's ruling. The State addressed this issue in its brief to this court stating that the petition was time-barred. The Petitioner argues that since the State failed to raise the defense prior to the coram nobis court's ruling, the coram nobis court erred in summarily dismissing the petition. We disagree. Although the coram nobis court dismissed the petition as untimely, it also held that due process concerns did not require tolling the statute of limitations. The coram nobis court had the discretion to dismiss the petition without a hearing. See Richard Hale Austin v. State, No. W2005-02591-CCA-R3-CO, 2006 WL 3626332,at *5 (Tenn. Crim. App. Dec. 13, 2006), no perm. app. filed. (finding "Similar to habeas corpus hearings, coram nobis evidentiary hearings are not mandated by statute in every case"); Id. (quoting State ex rel. Edmondson v. Henderson, 421 S.W.2d 635, 636 (Tenn. 1967)) (finding that a petition of either type "'may be dismissed without a hearing, and without the appointment of counsel for a hearing'" if the petition does not allege facts showing that the petitioner is entitled to relief).

We must now determine whether the court properly dismissed the petition as untimely. In the present case, the judgment became final in 2001.[2] The Petitioner did not

---

[2] The record does not contain the Petitioner's original motion for new trial or the trial court's judgment denying the same. The date is derived from our prior opinion in the Petitioner's second petition for writ of error coram nobis, which was contained in the appellate record. The opinion reads, "The

file this petition for writ of error coram nobis until July 12, 2017, fifteen years after the statute of limitations expired. Although the petition was filed well outside the one-year statute of limitations, due process concerns might require tolling of the statute of limitations and allow the late-filed petition. Workman v. State, 41 S.W.3d 100, 101 (Tenn. 2001). In determining whether to toll the statute of limitations, this court "must weigh the petitioner's interest in obtaining a hearing to present a later-arising ground for relief against the State's interest in preventing stale and groundless claims." Id. (citing Workman, 41 S.W.3d at 103). In weighing these interests, courts should conduct the following analysis:

> (1) determine when the limitations period would normally have begun to run;
> (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and
> (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

Id. (citing Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995)).

Again, the statute of limitations began to run in 2001 and expired in 2002. The Petitioner did not file this petition for writ of error coram nobis until 2017. In determining whether the newly discovered evidence is later-arising, the Petitioner contends that he was not aware of the evidence prior to March 2017. In 2017, the Petitioner claims that his ex-girlfriend, Castor, contacted him and told him that prior to the Petitioner's trial, she heard the Petitioner's father tell the Petitioner's mother that he (the father) was the one who shot Da'Shon Martin, not the Petitioner. The Petitioner alleges that he was not aware of the statement until 2017 and had no way of knowing about the statement because prior to his trial, Castor moved and lost contact with the Petitioner.

While Castor's affidavit was produced after 2002, the statement contained in the affidavit occurred in 1997 and related back to the Petitioner's theory that his father committed the murder. As the coram nobis court noted in its order dismissing the Petitioner's petition for writ of error coram nobis and this court noted in the Petitioner's prior appeals, the Petitioner had the opportunity to present this theory at trial and again at his post-conviction hearing. This court has twice rejected the Petitioner's prior petitions seeking relief on similar grounds having concluded that due process considerations did

Petitioner's motion for a new trial was denied on March 8, 2001." Therefore, the judgment became final thirty days later on April, 7, 2001. See Rhyunia Lamont Barnes, 2016 WL 537127, at *9.

- 10 -

not warrant tolling of the statute of limitation. See Rhynuia L. Barnes, 2011 WL 6322500, at *1, *6 (noting that the Petitioner received an alleged July 2002 letter from his father confessing to the murder but failed to include it in his March 2004 post-conviction relief petition); Rhyunia Lamont Barnes, 2016 WL 537127, at *1 (due process considerations did not warrant tolling of statute of limitation based on overwhelming proof of guilt at trial and failure to demonstrate actual innocence). We similarly conclude that a strict application of the statute of limitation would not deny the Petitioner the opportunity to present this claim, and he is not entitled to relief.

## CONCLUSION

Based upon the foregoing reasoning and analysis, the judgment of the coram nobis court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE