# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 27, 2015

## RHYUNIA LAMONT BARNES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 97-D-2542      Steve Dozier, Judge**

---

### No. M2015-01061-CCA-R3-ECN – Filed February 10, 2016

---

A Davidson County jury convicted the Petitioner, Rhyunia Lamont Barnes, of first degree premeditated murder, and the trial court sentenced him to life in prison. The Petitioner appealed, arguing that there was newly discovered evidence. This Court affirmed the Petitioner's conviction. *State v. Rhyunia Lamont Barnes*, No M2010-00631-CCA-R3-CD, 2002 WL 1358717, at \*1 (Tenn. Crim. App., at Nashville, June 24, 2008), *perm. app. denied* (Tenn. Dec. 2, 2002). In 2009, the Petitioner filed a petition for a writ of error coram nobis, which the coram nobis court summarily dismissed on the basis of it being untimely filed. This Court affirmed that judgment. In 2015, the Petitioner filed this, his second petition for a writ of error coram nobis, alleging that he had newly discovered evidence in the form of an ATF report that exonerated him as well as some emails between his attorney and the prosecutor that indicated his innocence. The coram nobis court summarily dismissed the petition, finding that it was untimely filed and that the allegations contained therein, even taken as true, did not prove his innocence or that the result of his trial would have been different. On appeal, the Petitioner contends that the coram nobis erred when it summarily dismissed his petition and that he is entitled to coram nobis relief. After a thorough review of the record and applicable authority, we affirm the coram nobis court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J. delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ. joined.

Rhyunia Lamont Barnes, Pikeville, Tennessee, pro se.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Glenn R. Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION
## I. Facts
## A. Trial

The Davidson County grand jury indicted the Petitioner on November 10, 1997, for the first degree premeditated murder of Carlton Martin that occurred on September 2, 1997. This Court summarized the evidence presented against him at trial as follows:

Joyce Martin testified she lived with her two sons, 24 year-old Da'Shon Martin, the victim, and 19 year-old Carlton Martin. She stated that on September 2, 1997, at approximately 2:00 p.m., Tom Morrell, a neighbor, came to her door and asked if the victim w[as] home. Martin responded the victim was sleeping in his room, and Morrell walked toward his room and told the victim someone wanted to see him. Morrell then walked out of the residence and returned to his home. Martin stated she looked outside her house and saw the [Petitioner], whom she had never met, standing at her gate. The victim exited the residence, stood on the porch, and inquired what the [Petitioner] wanted. Martin said she next saw the [Petitioner] brandish a pistol, at which time the victim ran back inside the house. The [Petitioner] then said, "Your son stole my jewelry, and I'm going to kill him;" the victim ran to the back of the house; and the [Petitioner] ran to her backyard with his gun in his hand. Martin explained her back door was secured by a deadbolt key lock which required a key to open.

Martin further testified she phoned 911 while the victim was hiding in the back of the residence, and the [Petitioner] was in the backyard. The [Petitioner] then ran back inside her front door holding his gun. The [Petitioner] then said twice that he would shoot the victim's mother if the victim did not come out of hiding. At that point, the [Petitioner] ran toward the bathroom at the rear of the house, and another man, later identified as James Barnes, the [Petitioner's] father, entered the residence and inquired about his son. Martin told James Barnes the [Petitioner] went to the rear of the house. Martin testified she then heard one shot and fled from the residence to a neighbor's home. Martin identified the murder weapon as the gun she saw in the [Petitioner's] hand.

Tommy Morrell, a neighbor, testified that on September 2nd, the [Petitioner] arrived at approximately 3:00 p.m. riding in the front seat of a vehicle driven by an older man. Morrell testified the [Petitioner] requested he get the victim. Morrell further stated he went inside the victim's house

2

and told the victim "two guys" wanted to see him, and Morrell exited the house. When Morrell reached the front gate, he saw the victim step onto the porch. Morrell later saw the [Petitioner] go inside the gate. Morrell further stated the older man was seated in the car.

Morrell explained he knew "something [was] going down," so he went back to his house and instructed his mother to stay inside. Morrell stated the older man exited the car; the [Petitioner] first ran in the house but then exited the house telling the older man that "[the victim] might have gone out the backdoor;" the [Petitioner] ran around one side of the house, while the older man ran around the other; the [Petitioner] ran back around to the front of the house and entered it brandishing a gun; the older man entered the house; and he heard a gunshot. Morrell stated he never saw the older man with a gun. On cross-examination, Morrell denied receiving drugs as compensation for summoning the victim outdoors.

Metro Police Officer Jerry Bottom testified he arrived on the scene within one minute of receiving the dispatch and saw the [Petitioner] running across the street holding his waistband. Officer Bottom stated his first priority was the victim, and since a second cruiser had arrived, he entered the victim's residence through the open front door and found the wounded victim on the floor. Officer Bottom stated he saw a man standing by a parked car when he initially arrived; he was unsure if the [Petitioner] ran from inside the home; and the interior of the home exhibited no signs of a struggle.

Metro Police Officer Marshall James Brown testified he and his partner, Officer Chris Locke, arrived at the scene immediately after Officer Bottom. Officer Brown stated that while he and Officer Locke were walking toward the residence, the [Petitioner] ran from across the street and dove head first into the backseat of a parked car. He additionally stated James Barnes walked toward the vehicle's driver's side. He and Locke then detained them, and Joyce Martin identified them as the persons in her home. On cross-examination, Officer Brown stated James Barnes was bleeding from a cut on his hand.

Officer Chris Locke corroborated Officer Brown's testimony. He further testified the [Petitioner] made remarks after being arrested; he activated his pocket audio recorder to record the [Petitioner]; and he made notes during the [Petitioner's] outbursts. He testified the [Petitioner], while being handcuffed, stated that the victim should not break in his house and

3

steal his jewelry.  At that point, Officer Locke placed the [Petitioner] in the rear seat of the cruiser, activated his pocket audio recorder, and sat in the driver's seat for approximately one hour and fifteen minutes.  Officer Locke also wrote down the [Petitioner's] statements verbatim.  Officer Locke testified from his written notes, which indicated the [Petitioner] said:

> I went in the house with him; I didn't shoot him; I threw my dope in the alley; that's why I ran.  I ain't did nothing.  I ain't got no gun; what [are] you detaining me for . . . .  He needed to quit lying on me.  He finded [sic] no gun on me.  Why am I being detained?  I ran and dumped my dope and came back . . . No gun, no motive.  I ain't got no lie to tell.  I dumped my dope.  He stole my jewelry.

At that point, other officers found a gun in the [Petitioner's] line of sight, and the [Petitioner] said, "Man, ain't found no gun on me.  Man, how do you know it was me; that could have been anybody's.  Whose gun?  I know my lawyer will get me off.  I got money; I got big money.  Take me down so I can make bond."  The [Petitioner] also stated, "Man, he steals $4,000 worth of jewelry and I'm supposed to let it ride.  F* *k that s* *t, man."

Metro Police Investigator David Elmore testified he searched the area and found a gun hidden inside a plastic bag of clothing in a pile of garbage across the street from the victim's residence.

Metro Police Officer Charles Ray "Friday" Blackwood testified he searched the victim's residence and was unable to find a weapon; he recovered three live .38 shells from James Barnes' pocket; and the .38 revolver found in the garbage had five spent casings in its chambers.

Medical Examiner Dr. Bruce Levy testified the victim died as a result of three gunshot wounds fired from a distance of "greater than 18 to 24 inches" from the victim's body.  Although Dr. Levy stated the victim had small abrasions on his chin, arm, back, and abdomen, he opined they were not the result of a struggle.

Danny Morris, a specialist in latent fingerprint analysis with the Metro Police Identification Division, testified a palm print was recovered from the weapon that did not match the [Petitioner's] print.  Morris explained, however, this evidence did not definitively establish that the

4

[Petitioner] never handled the gun since there are numerous reasons why one could touch a surface and not leave a latent print.

Metro Police Detective Kent McAlister testified he searched the crime scene and was unable to find a gun or spent shell casings. Det. McAlister stated although the [Petitioner] and James Barnes were initially both suspects, the charges against James Barnes were dropped at his preliminary hearing. He explained James Barnes was not initially fingerprinted because his hand was bandaged, and after the charges were dropped, it became impossible to obtain his prints.

Metro Police Detective Jeff West testified he assisted in interviewing the [Petitioner] at the police station. He testified that although he could not recall if the [Petitioner] and James Barnes were seated together while awaiting questioning, it was unlikely because standard procedure dictates they be separated. Det. West testified the [Petitioner] confessed to the crime and told him to release James Barnes because he had "nothing to do with it" and had tried to stop him from going into the Martin residence with his gun.

TBI firearms expert Steve Scott testified the shell casings and bullet fragments submitted for analysis were fired from the .38 revolver. Scott conceded the gun was not tested for the presence of blood or tissue, and it was possible for a person's hand to become injured if caught between the weapon's hammer and firing pin.

The [Petitioner] testified when he got in the car with his father, James Barnes, on September 2nd, he did so with the intention of receiving a ride to visit his son. The [Petitioner] stated his father requested the [Petitioner] direct him to the [Petitioner]'s drug supplier, a person by the name of "Ricko," which the [Petitioner] did. After their arrival, James Barnes asked Ricko the location of his stolen jewelry, and they drove to the [Petitioner]'s residence to replevy the jewelry. The [Petitioner] stated his father parked his vehicle on the street near the victim's residence, handed the [Petitioner] the revolver, and told the [Petitioner] to place it in his pocket. The [Petitioner] testified the gun remained in his shorts until he handed it back to James Barnes. He stated that, under the instruction of James Barnes, he gave Tommy Morrell drugs to summon the victim outside.

5

The [Petitioner] further testified he and James Barnes walked toward the residence, and the victim exited onto the porch. When the [Petitioner] inquired, "where [is] the jewelry," the victim ran back inside the home. The [Petitioner] stated he then stepped in the front room of the house, and the victim's mother told him to "get out;" he exited and ran around the side of the house, attempting entry through the back door; and since the door was locked, he returned to the front of the house where he handed James Barnes the gun. The [Petitioner] said he "[g]ave [James Barnes] the gun back [and] started out [of] the yard . . . thinking he's coming behind me . . . thinking it's over."

The [Petitioner] further stated once he arrived at the car, he realized his father had not followed him, so he re[-]entered the residence, went to the rear of the home, and saw the victim run to the bathroom. He then attempted to open the bathroom door, which was either locked or being held, and as he started to leave the home again, James Barnes fired a shot through the bathroom door. After the shot was fired, the victim exited the bathroom and struggled for the gun with James Barnes. The [Petitioner] stated that after a brief struggle, James Barnes fired shots, handed the [Petitioner] the gun, and they exited the home. The [Petitioner] stated he then ran across the street and discarded his "eighty-ball" of "dope" and the gun. He stated that he ran back to the car because he thought he left his beeper in the car and then dove into the car.

The [Petitioner] stated he had no intention of killing the victim, and after he was arrested, he made admissions to Officer Locke because "in [his] neighborhood, it's like, you try to make the police as mad as you can by being as smooth as you can with them. You just smart off to them, just try to smart off to them, make them mad cause like-that's all I was doing was really just mouthing off."

The [Petitioner] further testified he was seated next to his father at police headquarters, and his father intimidated him, so he confessed to the crime. The [Petitioner] explained he was fearful of his father, and his father had always said "the worst thing you can be is a snitch."

The [Petitioner] further testified he "probably" threatened to shoot the victim's mother, but did so to try to scare her out of the house so "no more innocent bystanders [would get] hurt;" he got blood on his shorts while attempting to protect the victim by trying to separate James Barnes from him; and James Barnes wiped the gun clean prior to giving it to him.

6

The [Petitioner] further admitted he had contact with James Barnes while awaiting trial on bond, and he conceded he said he was on bond because of the person he killed, but explained it was just "everyday neighborhood talk."

Saunte Lewis Young, the [Petitioner]'s sister, testified the [Petitioner] never owned jewelry; James Barnes wore jewelry; James Barnes had previously "cut" the [Petitioner]; and they had previously shot at each other. Sandra Barnes, the [Petitioner]'s mother, testified the [Petitioner] and James Barnes had a bad relationship, but she had requested the [Petitioner] try to get along with him.

The jury convicted the [Petitioner] of premeditated first degree murder.

*Barnes*, 2002 WL 1358717, at *1-5. The Petitioner appealed this Court's affirmance of his conviction and sentence, and the Tennessee Supreme Court denied the Petitioner's request to appeal. *Id.*

### B. Post-Conviction

In 2003, the Petitioner filed a petition for post-conviction relief in which he alleged that his trial counsel was ineffective and that his constitutional right to confront witnesses had been violated. The post-conviction court appointed the Petitioner counsel, held a hearing, and dismissed the petition. The Petitioner appealed, and, on appeal, this Court summarized the facts presented during the post-conviction hearing as follows:

At the post-conviction hearing, trial counsel testified that the [P]etitioner's defense was that Barnes shot the victim and coerced the petitioner to confess to the crime through intimidation. Counsel stated that she was aware that both the [P]etitioner and his father were arrested as co-suspects and that Barnes had three .38 caliber shells in his pocket and an injury on his hand. She further testified that, after the murder weapon was recovered and analyzed for prints, the results revealed that the prints lifted from the gun did not match those of the [P]etitioner. While she acknowledged that she believed the print may have belonged to Barnes, she stated that she was not aware of any way to compel him to provide prints for comparison. She further stated that she did not entertain the possibility of getting the print surreptitiously because she did not know where Barnes was. Counsel also stated that she did not recall whether the police

7

conducted a gunshot residue test on either the [P]etitioner or Barnes to determine who, in fact, fired the weapon.

Counsel also stated that, although she "would have loved to" have interviewed Barnes, she never attempted to, and further explained, "I did not know where [ ] Barnes was. I talked with [the Petitioner] on several occasions about getting [ ] Barnes involved in this case and [the Petitioner] did not want to do that." She further testified that the [P]etitioner would not assist her in locating Barnes. Counsel stated that she spoke with both the [P]etitioner and his mother during trial about getting Barnes involved in the [P]etitioner's defense; however, she stated, "They were both fearful of [ ] Barnes, and I told them that the police would protect them and they laughed at me." Regarding the failure to call Barnes as a witness, counsel testified that his absence from the witness list was a strategic decision based on the understanding that, if called to the stand, Barnes would incriminate the [P]etitioner.

As to the double hearsay statement introduced by the State via audiotape, counsel explained that she filed a motion in limine, which was granted by the trial court, to preclude all of Barnes' hearsay statements. She testified that she did not know that the State was going to play the tape as they were under court order not to introduce such statements. She further stated that once the tape began to play, she expected the State to stop the tape before the hearsay statement was played. Counsel testified that after Barnes' hearsay statement played, she was "very angry" and:

> was kind of wondering if [she] should stand up and make a big deal out of it in front of the jury or if [she] should wait until there was an opening and a break for [her] to kind of slip and not call a lot of attention to what had happened in front of the jury.

When asked why she did not object before the statement played, she reiterated that she thought the State was going to stop the tape prior to that point. Specifically, she stated, "I had no idea the State was going to play it, sir. The State was under an order not to put in any hearsay statements by [ ] Barnes, and I trust a court order."

On cross-examination, [C]ounsel testified that she met with the [P]etitioner weekly in the four months preceding trial, with each meeting lasting between thirty minutes and one hour. She further stated that an

8

investigator talked to neighborhood residents, the victim's mother, and had "a lot of contact" with the [P]etitioner. Counsel also testified that she reviewed all discovery material and discussed trial strategies with the [P]etitioner, considering every possible defense available to him, prior to trial.

Counsel testified that she knew that the [P]etitioner told police he acted alone in killing the victim and that the victim's mother identified the [P]etitioner as entering the home with a gun and chasing the victim to the back of the house. Counsel stated that, based upon the facts of the case, she believed the only available defense was that the [P]etitioner gave a false confession and that Barnes had, in fact, murdered the victim. She reiterated that the [P]etitioner made it clear on multiple occasions that he did not want to involve his father in the defense because he was afraid of him. Counsel testified that she felt that calling Barnes as a witness carried an "extremely high" risk and that she thought it would be more beneficial to assert that the [P]etitioner was not the killer if his father was not present; she believed this position would be bolstered by the fingerprint analysis indicating that the [P]etitioner's prints were not on the weapon.

Counsel further stated that it "would have been very nice" to have been able to determine whose prints were left on the murder weapon; however, she knew of no legal vehicle that could have been utilized to compel Barnes, who was not a criminal defendant, to submit to print analysis.

As to the double hearsay statement, counsel reiterated that she believed the State was under court order not to produce hearsay statements of Barnes and that she did not object to the playing of the tape because she thought the State had redacted the portion of the tape containing the hearsay statement. Counsel recalled that she requested a mistrial after the statement played; however, it was denied by the trial court. She also acknowledged that the statement was consistent with the defense theory that Barnes killed the victim and forced the [P]etitioner to accept responsibility.

On redirect examination, counsel reiterated that, although she wanted to speak with Barnes, the [P]etitioner did not want to involve him in the case. As a result, counsel determined that "it might be easier to point the finger at someone who [was] not there." She further acknowledged that the jury heard Barnes' hearsay statement and that the [P]etitioner never got the benefit of cross-examination from defense counsel. Counsel also

9

admitted that she did not consult with other attorneys about how she might obtain Barnes' prints for comparison. Finally, she acknowledged that she was mistaken in believing that the motion in limine excluded the taped statement and further explained:

> I had an order from The Court saying there were no statements of [ ] Barnes to be put in front [of] a jury. So I trust a court order. And based upon my experience of trying other cases, I know that the State is very good about keeping hearsay statements out.
>
> . . . .
>
> I believed that court order absolutely protected [the Petitioner].

Sandra Barnes, the [P]etitioner's mother, recalled that both her son and her husband were arrested for the shooting death of the victim. She further testified that, although they maintained separate residences, she saw Barnes more than once a week because they lived in the same neighborhood. She stated that Barnes was living openly in Nashville and was not avoiding defense counsel or the police. Finally, she stated that Barnes did not leave town during the [P]petitioner's trial.

The [P]etitioner testified as the final witness at the post-conviction hearing. He stated that his defense at trial was that his father shot and killed the victim. He further testified that the police did not perform a gunshot residue test on him or his father. The [P]etitioner stated that he submitted to fingerprint analysis and that the results indicated that his prints did not match those taken from the murder weapon. He also testified that he showed the investigator where his father lived, and when asked whether he instructed counsel to involve his father, the [P]etitioner responded, "Anything that is going to get me off, do what you have to do." Finally, he stated that his father passed away in October 2002.

At the conclusion of the hearing, the post-conviction court took the petition under advisement and subsequently issued an order denying relief. Regarding the Confrontation Clause issue, the post-conviction court opined:

> Whether this issue is defined as prosecutorial misconduct, breach of the hearsay rules, or violation of the right of

confrontation, the trial court gave a curative instruction and the Court of Criminal Appeals ruled that that instruction cured any error. Any consideration of prejudice must be measured against the facts testified to at trial and the [P]etitioner's multiple confessions that he killed the victim.

As to the remaining issue of ineffective assistance of counsel, the court found that "in all respects, except possibly one, the trial counsel's services were well within the range of competence demanded by attorneys in criminal cases." The court went on to note that the only possible exception, trial counsel's failure to require redaction of the double hearsay played before the jury, was remedied when the trial court gave a curative instruction, which was held by this Court to be sufficient to curtail any prejudice that might have resulted. In sum, the court found that, "[I]f there was error on counsel's part it was not an error that had an adverse effect on the verdict." Therefore, the trial court denied post-conviction relief and the [P]etitioner filed a timely appeal to this court.

*Rhynuia L. Barnes v. State*, No. M2004-01557-CCA-R3PC, 2005 WL 2139408, at *2-6 (Tenn. Crim. App., at Nashville, Sept. 2, 2005), *perm. app. denied* (Tenn. Feb. 6, 2006). On appeal, this Court, when reviewing the claim under the Confrontation Clause, concluded that counsel was not ineffective and that the statement did not prejudice the Petitioner. We further concluded that the evidence did not preponderate against the post-conviction court's finding that Counsel rendered effective assistance of counsel. *Id.* at *1.

## C. Error Coram Nobis

In October 2009, the Petitioner filed his first petition for a writ of error coram nobis, alleging that a letter written by his late father, confessing to the murder, was newly discovered evidence. *Rhyunia L. Barnes v. State*, No. M2010-01554-CCA-R3-CO, 2011 WL 6322500, at *5 (Tenn. Crim. App., at Nashville, Oct. 27, 2011). The trial court summarily dismissed the petition because it was "filed more than one year after the statutory limitations period," and the Petitioner "had been given reasonable opportunity to present such evidence at this trial and during the post-conviction proceedings." *Id.* The Petitioner appealed to this Court, and we affirmed the lower court's dismissal. *Id.* at *7. After reviewing the issue, we concluded that a strict application of the statute of limitations in this case would not deny the Petitioner a reasonable opportunity to have presented the claim of newly discovered evidence. *Id.* We noted that the Petitioner did not present written proof of his claim in the nature of a "confession" by his father in a

11

signed and dated document within a reasonable time period and, instead, he waited seven more years to rely on an unsigned, undated document. *Id.*

In March 2015, the Petitioner filed the petition for writ of error coram nobis that is the subject of this appeal. In the petition, the Petitioner alleged that there was newly discovered evidence in his case. He asserted that the State wrongfully failed to give the defense a report from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), which would have exonerated him of this killing.

In his petition supporting this allegation, the Petitioner stated that:

> On October 14, 1997, Kenneth McAlister sent an E-mail to District Attorney Kimberly Haas, informing her of the following:

> I ran a check through A.T.F. and the woman the car belonged to they was driving that day b[ought] the gun in a pawn shop on Gallatin Road.

He further alleged that other emails from Mr. McAlister, who worked in the same office as Ms. Haas, promised to send Ms. Haas the ATF report. The Petitioner avers that another email from Ms. Haas stated that she would once again be prosecuting an innocent man for murder, referring to the Petitioner's case.

The Petitioner claimed that the ATF report was never provided to the defense. He asserts that this report would have provided exculpatory evidence by showing: (1) that the woman in the report was James Barnes's girlfriend, (2) that she gave James Barnes access to her car and the gun in question; and (3) that his fingerprints were not found on the gun, proving he was not the shooter.

The Petitioner stated that he did not receive copies of these emails until January 27, 2015, when the State turned them over pursuant to his Public Records Act request.

Attached to the petition are the emails about which the Petitioner complains. In an email dated October 14, 1997, from Mr. McAlister to Ms. Haas, Mr. McAlister stated:

> [The Petitioner] said his father knew they were going to look for the victim in his statement. [The Petitioner] also said he bought the gun fr[o]m a 'junkie' on the street. I ran a check through A.T.F. and the woman the car belonged to they were driving that day bought the gun in a pawn shop on Gallatin Road. [The Petitioner's] father had some live rounds in his pocket.

12

Look at maybe an accessory case on him. I'll send you a copy of the A.T.F. report.

On October 15, 1997, Mr. McAlister sent Ms. Haas another email stating:

I understand. I just wanted you to know about the gun and the ammo. Something else I forgot to tell you yesterday, the victim['s] mother said the father had a gun but just like you said we did not find one. When I interviewed her she just said he had one but at the preliminary hearing she changed her story and said he pointed it at her. I just wanted you to know because I feel sure she will bring this up again.

In August 1999, two years later, there are an exchange of emails between the Petitioner's attorney and Ms. Haas. The Petitioner's attorney states to Ms. Haas:

Dear Colonel,

I have the dubious honor to inform you that the motion on [the Petitioner] is currently set for October 14, 1999 at 1:15 in the afternoon before Lieutenant Kurtz. It is with bated breath that I eagerly await to hear your response to this motion especially to grounds 2 through 4.

Sincerely,
Kevin Sanders, Sub-Private First Class.

Ms. Haas's response was:

I have not received the motion to which you refer, so I am breathlessly awaiting its receipt since it is probably as bitchy as its proponent. Just to let you know, I will be (once again prosecuting an innocent man for murder in Div 1 that week, and might not be out of trial by 10/14 (it is a very convoluted circumstantial case). I guess I can just tell LT Kurtz to drop and give me twenty if he gives me any trouble with the def. motion!!!!

Based upon this evidence, the coram nobis court summarily dismissed the Petitioner's petition. It found:

The [P]etitioner asserts that he has newly discovered evidence in the form of an A.T.F. report as mentioned in an email from Kenneth McAlister to Assistant District Attorney Kymberly Haas. The email informed Ms. Haas that he "ran a check through A.T.F. and the woman the car belonged

13

to [that] they were driving that day bought the gun in a pawn shop on Gallatin Road." The [P]etitioner alleges the A.T.F. report would be exculpatory in that it would show that the woman in the report was James Barnes' girlfriend, and she gave James Barnes access to her car and the gun in question. Further, he alleges that it would have helped his defense at trial by showing the jury why his finger prints were not found on the gun and that he was not the shooter.

As noted in the [P]etitioner's direct appeal,

> The [S]tate's proof established the following: The [Petitioner] entered the victim's home brandishing the murder weapon, demanded his jewelry, and told the victim's mother he intended to kill the victim. The [Petitioner] went around to the back of the residence seeking the victim and, not being able to unlock the back door, reentered through the front door. He threatened to kill the victim's mother. The victim was shot three times at close range; the [Petitioner] discarded the weapon outside; and the [Petitioner] confessed to the crime at the police station, stating his father had "nothing to do with it."

*Barnes*, Tenn. Crim. App. 2002 WL 1358717 at 11.

In addition, the appellate court indicated

> [t]he record reflects that overwhelming proof was presented at trial implicating the [P]etitioner as the murderer. Specifically, the evidence established that the [P]etitioner requested that Morrell summon the victim from his home, that the petitioner brandished a weapon, and that he accused the victim of stealing his jewelry. The record further reflects that the [P]etitioner chased the victim to the back of the residence and threatened to kill the victim's mother if the victim did not come out. The [P]etitioner then ran outside as Barnes entered the residence to inquire as to his son's whereabouts. Immediately thereafter, the victim was shot three times and died as a result. During an interview at the police station following the incident, the [P]etitioner confessed to killing the victim.

14

*Barnes*, Tenn. Crim. App. 2005 WL 2139408 at 6.

This petition was filed more than one year after the statutory limitations period. The [P]etitioner's motion for a new trial was denied March 8, 2001.[FN1] Therefore, the Court finds that the [P]etitioner's claims are untimely, approximately thirteen (13) years beyond the one year statute of limitations. The Court finds that due process considerations do not preclude the application of the limitations period. The [P]etitioner could have requested this information within a reasonable time giving him ample opportunity to request relief within the limitations period. Further, even if taken as true, this "newly discovered evidence" does not show the [P]etitioner was actually innocent nor would this new evidence possibly lead to a different result. Rather, the record reflects that overwhelming proof was presented at trial implicating the [P]etitioner as the murderer. Therefore, the petition is dismissed.

[FN1] The [P]etitioner's final direct appeal was denied December 2, 2002.

It is from this order that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the coram nobis court erred when it summarily dismissed his petition and that he is entitled to coram nobis relief. He asserts that due process considerations require that the statute of limitations be tolled. He states that the prosecution's email was not a joke and that the prosecutor knew that she was prosecuting an innocent man. He further asserts that he has been unable to obtain the ATF report from the State since learning of its existence. The State concedes that the trial court dismissed the petition as time-barred even before it raised the statute of limitations as an affirmative defense. It asserts, however, that this Court should affirm the lower court's summary dismissal because the petition does not state a colorable claim for coram nobis relief.

A writ of error coram nobis is available to a defendant in a criminal prosecution. T.C.A. § 40-26-105(a) (2014). The decision to grant or to deny a petition for the writ of error coram nobis on its merits rests within the sound discretion of the trial court. *Ricky Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999); *State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). As previously noted by this Court, "the purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1996)).

To establish that he is entitled to a writ of error coram nobis, the Petitioner must show: (a) the grounds and the nature of the newly discovered evidence; (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial; (c) that the Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (d) the relief sought. *Hart*, 911 S.W.2d at 374-75. Affidavits should be filed in support of the petition. *Id.* at 375.

The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

*Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003). "Similar to habeas corpus hearings, coram nobis evidentiary hearings are not mandated by statute in every case." *Richard Hale Austin v. State*, No. W2005-02591-CCA-R3-CO, 2006 WL 3626332, *5 (Tenn. Crim. App., at Jackson, Dec. 13, 2006), *no Tenn. R. App. P. 11 filed*. A petition of either type "'may be dismissed without a hearing, and without the appointment of counsel for a hearing'" if the petition does not allege facts showing that the petitioner is entitled to relief. *Id.* (quoting *State ex rel. Edmondson v. Henderson*, 421 S.W.2d 635, 636 (Tenn. 1967)).

16

A petition for a writ of error coram nobis must be filed within one year of the judgment becoming final in the trial court. T.C.A. § 27-7-103. This statute of limitations "is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed post-trial motion." *Harris v. State,* 301 S.W.3d 141, 144 (Tenn. 2010); *see Mixon,* 983 S.W.2d at 670 ("[W]e reject the contention . . . that the statute does not begin to run until the conclusion of the appeal as of right proceedings."). In the present case, the judgment became final in 1998. The Petitioner did not file this petition for writ of error coram nobis until July 2014, more than fifteen years later.

The one-year statute of limitations for a petition for writ of error coram nobis may be tolled on due process grounds if a petition seeks relief based upon newly discovered evidence of actual innocence. *Harris,* 301 S.W.3d at 145. In determining whether the statute should be tolled, the court must balance the petitioner's interest in having a hearing with the State's interest in preventing a claim that is stale and groundless. *Id.* Generally, "before a state may terminate a claim for failure to comply with . . . statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." *Burford v. State,* 845 S.W.2d 204, 208 (Tenn. 1992). The *Burford* rule requires three steps:

> (1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

*Sands v. State,* 903 S.W.2d 299, 301 (Tenn. 1995). As a general rule, the claim at issue must not have existed during the limitations period to trigger due process consideration. *Seals v. State,* 23 S.W.3d 272 (Tenn. 2000). Discovery of or ignorance to the existence of a claim does not create a "later-arising" claim. *See Brown v. State,* 928 S.W.2d 453, 456 (Tenn. Crim. App. 1996); *Passarella v. State,* 891 S.W.2d 619, 635 (Tenn. Crim. App. 1994).

The State bears the burden of raising the bar of the statute of limitations as an affirmative defense. *Harris*, 102 S.W.3d at 593. This Court has stated that "the statute of limitations is an affirmative defense which must be specifically pled or it is deemed waived." *Newsome v. State*, 995 S.W.2d 129, 133 n.5 (Tenn. Crim. App. 1998). This Court has affirmed a coram nobis court's summarily dismissal of a petition for writ of error coram nobis when the dismissal occurred before the State responded and asserted a

statute of limitations defense when the petition had been filed after the statute of limitations had tolled. *See Antoinette Hill v. State*, No. E2013-00407-CCA-R3-PC, 2013 WL 5634108, at *3 (Tenn. Crim. App., at Knoxville, Oct. 16, 2013), *perm. app. denied* (Tenn. Apr. 8, 2014) (citing *State v. Johnny L. McGowan, Jr.*, No. M2007-02681-CCA-R3-CO, 2008 WL 4170273 (Tenn. Crim. App., at Nashville, Aug. 5, 2008)).

In the case under submission, we conclude that the trial court properly determined that the petition was time barred and that due process considerations did not require a tolling of the statute of limitations. The Petitioner's motion for a new trial was denied March 8, 2001. His appeal was denied on June 24, 2002, and the Tennessee Supreme Court denied his application to appeal on December 2, 2002. His petition for writ of error coram nobis was filed March 28, 2015, well beyond his one-year statute of limitations. Further, as noted by the coram nobis court, the evidence against the Petitioner was overwhelming, so due process does not require tolling of the statute of limitations. Even if the Petitioner's allegations are taken as true, and there is an ATF report that shows that the Petitioner's father's girlfriend purchased the murder weapon, the facts remain that the Petitioner approached the victim's house, told the victim's mother he intended to kill the victim for stealing his jewelry, and chased the victim to the yard behind the home where the victim was shot and killed. The Petitioner was seen discarding the murder weapon, and he confessed to police that he killed the victim. The fact that his father's girlfriend purchased the murder weapon is not a fact that may have resulted in a different judgment if the evidence had been admitted at the previous trial. Lastly, it is quite obvious that the email exchange between attorneys Sanders and Haas contains sarcasm and attempts at "humor" by both attorneys. The e-mail exchange certainly does not constitute newly discovered evidence that would warrant error coram nobis relief. The Petitioner is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the coram nobis court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE