

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-18-00041-CV

IN THE MATTER OF THE MARRIAGE OF BOBBY R. WILLIAMS, SR.,
AND YOLANDA WATERS WILLIAMS

On Appeal from the County Court at Law
Panola County, Texas
Trial Court No. 2015-223

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

MEMORANDUM OPINION

After a seventeen-year marriage, Bobby R. Williams, Sr., and Yolanda Waters Williams were divorced in the County Court at Law of Panola County, Texas. Bobby now appeals from the final decree of divorce, arguing that the trial court abused its discretion in dividing the community estate.

## I.     Procedural and Factual Background

Bobby and Yolanda were married on August 22, 1998.[1] According to the pleadings, Bobby and Yolanda separated in April 2015. Bobby filed for divorce on June 10, 2015, and Yolanda answered and filed a counterpetition for divorce on July 1, 2015. Bobby accused Yolanda of committing adultery, and each accused the other of domestic violence, misuse of community property, disparity in earning capacity, and using separate bank accounts to hide community funds. Accordingly, both sought a disproportionate share of the community assets. Yolanda also sought reimbursement for $13,611.43 in accrued attorney fees. The parties eventually reached an agreement regarding division of their personal property, vehicles, some bank accounts, and credit card debts, but disputed the proper valuation and disposition of their marital residence, thirty-two acres surrounding the residence, and some other real property.

### A.     The Parties' Real Estate

In 1999, the couple purchased, for $40,000.00, a home situated on five acres, which was listed as parcel number 7649 by the Panola County Appraisal Rolls, with an address of 1315 Spring

---

[1]There were no children of the marriage, though Bobby had two sons, Bobby, Jr., and James, and Yolanda had a son and daughter, all from prior relationships.

Street, Carthage, Texas. Bobby testified that he paid $4,000.00 as a down payment from a $50,000.00 personal injury settlement he had received during the marriage and that the remaining balance was financed by the seller at ten percent interest.[2] Bobby and Yolanda lived in the home for much of their marriage.[3]

In 2001, again using the settlement funds, the couple purchased two tracts that adjoined the five-acre homeplace—a ten-acre tract, listed as parcels 15104 and 7650, and a seventeen-acre tract, listed as parcel number 19996—for the same price and on the same terms as their home purchase. In 2009 or 2010, Bobby and Yolanda refinanced their home and the five surrounding acres to pay off the original seller. They also used the loan proceeds to pay for the twenty-seven adjoining acres. Bobby testified that, at the time of the divorce, the balance of the house refinance loan was approximately $20,000.00.

### B . Graceland Personal Care Homes, Inc.

#### 1. Original Facility

Bobby testified that, before and during the marriage, he operated Graceland in Carthage. He claimed that the business and the real property it was located on had been his separate property since 1989. Yolanda disputed that claim. She testified that she was a manager at Graceland and that the business was community property. She explained that, as a manager at Graceland, she "was just basically running the home, and her job included ensuring that residents were dressed,

---

[2]Bobby testified that he deposited the $50,000.00 into the account of his business, Graceland Personal Care Homes, Inc., a state-licensed, assisted-living home in Carthage, Texas, rather than a community bank account.

[3]Bobby testified that the $40,000.00 in materials used in the renovations to the home were paid for from the personal injury settlement he received during the marriage, while Yolanda claimed that the renovation funds came "from [their] household funds."

fed, and properly medicated and that they were transported to their appointments for medical care, therapy, or adult daycare." Although the business started off slowly, it generated "a substantial living" for several years during the marriage. However, at the divorce hearing, Bobby testified that the business had not "made any money for a long time."

### 2. Velma's Place

Graceland began operating a second assisted-living facility, known as Velma's Place, in a house that was Yolanda's separate property. In order to prepare the house for business use, it was renovated, and an additional seven-hundred square feet of heated space was added. Bobby testified that he paid $40,000.00 for the renovation to Velma's Place from Graceland's account. However, he admitted that he did not know the value of the home before or after the renovations. Graceland leased the property from Yolanda, and they used the lease payments to reimburse the cost of the renovations. Graceland initially moved some of its assisted-living-facility residents to Velma's Place to get it started. However, the business closed approximately two years later.

Yolanda denied that the renovations to the Velma's Place property enhanced its value. Rather, she claimed that the "plumbing was done incorrectly," that the addition "caused the roof to leak," and that the additional heated square footage "burned up the heating and cooling system." She also claimed that a "separate sewer system" was created that required a lot of work. Because of these issues, Yolanda claimed that she was unable to rent or use the additional space since she separated from Bobby. Accordingly, she closed off the addition from the rest of the home.

4

### 3. Carrie's Place

After establishing Velma's Place, Graceland also started operating a third assisted-living facility, called Carrie's Place, at a home owned by Bobby Williams, Jr. Bobby and Yolanda were guarantors of the $80,000.00 mortgage on Carrie's Place. Graceland, doing business as Carrie's Place, leased the home from Bobby, Jr., and in exchange, Bobby, Jr., agreed to pay the property's $80,000.00 mortgage note payment and taxes. Yolanda denied that Bobby, Jr., owned the house, and the Divorce Inventory Summary Sheet prepared by Bobby identified the house as a community asset with a fair market value of $141,312.64.[4]

### C. The Parties' Allegations of Fault

Bobby testified that, in August 2005, he and Yolanda got into a fight. According to Bobby, Yolanda cut him, hit him in the head with an object, and pointed a gun in his face. Yolanda testified that she was also injured in the dispute and feared for her safety. The police were called, and Bobby was arrested. Bobby claimed that, while he was in jail, Yolanda and her son removed the residents out of Velma's Place and left the residents and their belongings in "the front yard." Bobby claimed that Yolanda did this knowing that moving the residents in this way violated state-required procedures and protocols.

Yolanda admitted that she moved the residents, but denied that she left them and their belongings in the front yard. Yolanda explained that she moved the residents out of Velma's Place so that she could move back into the house. She claimed that Velma's Place was her former residence prior to the marriage and that, due to their domestic dispute, she needed a place to live.

---

[4] The record does not contain a deed or other evidence regarding the ownership of the Carrie's Place property.

She also claimed that Bobby's son, Bobby, Jr., helped her move them. However, a rental agreement showed that Yolanda leased the house to another family in September 2005 for $700.00 per month. Bobby claimed that Yolanda never deposited that revenue into the family accounts. According to Bobby, the rental income from the property was significantly less than the property generated as an assisted-living facility.

Because the clients were moved to Carrie's Place without prior notice and state authorization, the State revoked Velma's Place's license and began actions to revoke Graceland's license as well. The State alleged that the residents of both facilities were placed in "imminent threat [and] danger." Bobby testified that Graceland was required to spend "close to $150,000" on attorneys, consultants, and nurses to prove that the facilities met state standards so they could maintain their licenses. Bobby requested reimbursement for those funds as part of the property division in the divorce.

Bobby testified that he successfully maintained the licenses, but that the State placed a vendor hold on the businesses and that the business lost several resident contracts. Although Graceland, Carrie's Place, and Velma's Place could have collectively accommodated thirty residents, at the time of the divorce proceeding, Carrie's Place was the only Graceland-affiliated facility still in operation, and it only housed five residents.

### D. Other Financial Disagreements

Bobby testified that he and Yolanda often disagreed about money and that they accused each other of hiding community funds. Yolanda testified that, at the time of the marriage, she had a master's degree in nutrition, was a registered dietician, worked full-time, and was also a manager

at Graceland. Bobby testified that Yolanda did not get a job until "after 2005" and that she put her earnings into her own accounts. He also testified that she refused to pay any of the household bills, which required him to pay for the house note, the taxes, and other family bills from 1998, when they got married, until 2010.

Bobby testified that, in 2010, they attended counseling and Yolanda agreed to pay approximately $340.00 per month towards household expenses. In addition, in 2012 or 2013, Yolanda made some of the house note payments. Bobby also admitted that, as a registered dietician, Yolanda created the food menus for each client, which saved Graceland the expense of hiring an outside dietician, but he denied that she contributed any funds to building or operating any of the Graceland facilities. Bobby also testified that they purchased a home in Carthage with community funds and that he spent between $15,000.00 and $17,000.00 on materials to renovate and expand the home. However, according to Bobby, when they sold the house for $52,000.00, Yolanda gave Bobby $1,000.00 and put the remaining $51,000.00 profit from the sale into her separate accounts.

Bobby admitted that, in 2008, he opened an Edward Jones investment account. According to Bobby, he and his son, James Williams, were co-owners of the account. Bobby also testified that James's godmother, Danita Sampson, had deposited $10,000.00 into the account and that he deposited at least two checks from Graceland for $5,529.10 and $899.95 into the account. Bobby also testified that, at one point, the account balance was $23,871.53. However, he denied that the Edward Jones account was community property. Accordingly, Yolanda did not learn about the account until 2016, during the divorce proceedings. There was also testimony that during the

7

marriage, Bobby paid, out of community funds, an earnest-money deposit on a four-acre tract of real property that is now owned by his father. However, Bobby denied any ownership of the property.

On cross-examination, Bobby testified that he and Yolanda started a church, God's Glory Christian Center. Bobby admitted that, at one time, there was as much as $37,000.00 in the church's bank account. However, as of 2015, it only contained about $9,000.00, and the church had not met in several years. Bobby explained that all checks from the church account had to be approved by two people affiliated with the church, usually himself and a deacon. He admitted that checks were written on the church account payable to himself, his brother, and a nurse that was assisting with some of Graceland's residents. However, he claimed that he never received any payment from the church for his services. Accordingly, the funds were an "accumulation of [his] salary over the years."

Bobby also admitted that he had used church funds to pay $1,000.00 per month on his Chase Bank and Sam's Club Discover credit cards. He explained that he did not disclose the balance of the church's account during the divorce because he believed "that church offering and tithe money [was] separate from [his] own personal estate." Bank records established that Yolanda withdrew $30,000.00 from their community bank account the day after she filed an answer and counter-petition for divorce, yet she admitted she had more than $25,000.00 in a separate savings account. Yolanda testified "[t]hat [$30,000] was used to pay some debt" and "purchase a heating and cooling system" and that only "a portion" of the money was left.

8

The couple's home on Spring Street was valued on the county tax rolls at $170,000.00 for the house and $97,650.00 for the thirty-two acres. Initially, the trial court ordered the Spring Street home and property to be sold. However, Bobby alleged that Yolanda hindered the sale by removing the listing agent's sign from the yard, and Yolanda alleged that Bobby hindered the sale by refusing to sign a listing agreement with Coldwell Banker. Bobby admitted that he refused to sign the agreement with Coldwell because the broker's agent significantly reduced the home's selling price.

### E. The Trial Court's Ruling

After considering the evidence and testimony presented in the divorce hearing, the trial court (1) granted a no-fault divorce, (2) awarded the personal property, vehicles, retirement, and bank accounts as per the parties' agreement, (3) found that the real property located at 2625 CR 302 (Graceland), Carthage, Texas, was Bobby's separate property, and (4) found that the real property located at 2253 CR 108 (Velma's Place) was Yolanda's separate property.[5] In dividing the community estate, the trial court awarded Yolanda the family home at 1315 Spring Street, together with twenty-two acres of the surrounding real property, identified by the appraisal roll parcel numbers 7649, 7650, and the western portion of parcel 19996 where the residence was located. The trial court awarded Bobby the real property located at 2631 CR 302 (Carrie's Place), the southern and eastern portions of parcel 19996, the property listed as parcel number 15104, and

---

[5]In the interest of judicial economy, we only discuss the trial court's awards that are in dispute on appeal.

a frame house and a mobile home that were moved onto a different tract of his separate property[6] during the marriage.

The trial court also awarded Bobby "the business known as Graceland," and "the business known as Carrie's Place." Each party was ordered to pay one-half of any unpaid ad valorem taxes on the home and the thirty-two acres, but the trial court granted Yolanda an equitable lien against the interests awarded to Bobby in parcels 19996 and 15104 in order to secure payment of Bobby's one-half of the ad valorem taxes. Except as specifically ordered, each party was generally ordered to pay the taxes, debt, and liability on the real property awarded to them. Finally, the trial court ordered the parties to pay their own attorney fees.

## II.    Analysis

In his sole point of error on appeal, Bobby argues that the trial court erred in awarding Yolanda what he described as "75% of the Community Estate."

### A.    Standard of Review

The Texas Family Code requires the trial court to divide a marital estate in a "just and right" manner, considering the rights of the parties. TEX. FAM. CODE ANN. § 7.001 (West 2006). The trial court may generally exercise broad discretion in dividing a marital estate. The party complaining of the trial court's property division must demonstrate from evidence in the record that the division was so unjust that the trial court abused its discretion. *Bigelow v. Stephens*, 286

---

[6]The property was located at 205 CR 3028, Carthage, Texas.

S.W.3d 619, 620 (Tex. App.—Beaumont 2009, no pet.).[7]  Accordingly, we will reverse the trial court's judgment only where it "clearly abused its discretion and if the error materially affects the court's just and right division of the property."  *Id.* (quoting *Nelson v. Nelson*, 193 S.W.3d 624, 628 (Tex. App.—Eastland 2006, no pet.)).  If there is any reasonable basis for doing so, we must presume that the trial court properly exercised its discretion.  *Pletcher v. Goetz*, 9 S.W.3d 442, 446 (Tex. App.—Fort Worth 1999, pet. denied).

Separate property is the property owned before marriage as well as property acquired during marriage through gift, devise, and descent.  TEX. FAM. CODE ANN. § 3.001 (West 2006).  All other property that is not separate property is community property.  TEX. FAM. CODE ANN. § 3.002 (West 2006).  "Property possessed by either spouse during or on dissolution of marriage is presumed to be community property."  TEX. FAM. CODE ANN. § 3.003(a) (West 2006).  To rebut this presumption, the person seeking to prove the separate character of the property must do so by clear and convincing evidence.  TEX. FAM. CODE ANN. § 3.003(b) (West 2006).  "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. FAM. CODE ANN. § 101.007 (West 2014).  "Any doubt as to the character of property should be resolved in favor of the community estate."  *In re Marriage of Moncey*, 404 S.W.3d 701, 706 (Tex. App.—Texarkana 2013, no pet.) (citing *Garza v. Garza*, 217 S.W.3d 538, 548 (Tex. App.—San Antonio 2006, no pet.)).

---

[7]Under an abuse of discretion standard, legal and factual sufficiency are relevant factors in assessing whether the trial court abused its discretion, *Beaumont Bank v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991), but they are not independent grounds of error.  *Ditraglia v. Romano*, 33 S.W.3d 886, 889 (Tex. App.—Austin 2000, no pet.).

Though not required to do so, courts may consider many other factors, such as

> the spouses' capacities and abilities, benefits which the party not at fault would have derived from continuation of the marriage, business opportunities, education, relative physical conditions, relative financial condition and obligations, disparity of ages, size of separate estates, and the nature of the property.

*Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981). Courts may also consider whether one spouse contributed less than an equal share to the family's finances or the development of the community estate. *See Zorilla v. Wahid*, 83 S.W.3d 247 (Tex. App.—Corpus Christi 2002, no pet.), *disapproved of on other grounds by Lliff v. Lliff*, 339 S.W.3d 74 (Tex. 2011); *Horlock v. Horlock*, 533 S.W.2d 52, 60 (Tex. Civ. App.—Houston [14th Dist.] 1975, writ dism'd w.o.j.).

### B.      Bobby's Contention

Bobby contends that, in awarding Yolanda the Spring Street residence and twenty-two acres of the surrounding property, the court awarded Yolanda seventy-five percent of the community estate. He also contends that, by its division, the court incorrectly characterized his son's property at 2631 CR 302 (Carrie's Place) as community property. He further argues that the trial court failed to consider that community work and assets were used to enhance Yolanda's separate property at 2253 CR 108 (Velma's Place), that Yolanda damaged the Graceland business by moving residents from Velma's Place to Carrie's Place, that she removed $30,000.00 from community bank accounts, and that Yolanda committed adultery and domestic violence.

### C.      Resolution of Bobby's Contention

The trial court was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). A just and right property division need not be equal, but it must be equitable. *Zeptner v. Zeptner*, 111 S.W.3d

727, 740 (Tex. App.—Fort Worth 2003, no pet.) (op. on reh'g). Here, the trial court dissolved the marriage "on the ground of insupportability." The undisputed evidence established that the alleged domestic violence and adultery occurred several years prior to the separation and divorce. Accordingly, the trial court could reasonably have considered that fault was not relevant to the property division.

Also, in dividing the community estate, the trial court reasonably could have believed the testimony and exhibits indicating that the Carrie's Place property was a community asset and that Bobby failed to rebut the presumption that it was community property. *See* TEX. FAM. CODE ANN. § 3.003(b); *City of Keller*, 168 S.W.3d at 819. Likewise, the trial court reasonably could have believed Yolanda's testimony that the addition to the Velma's Place property actually decreased its value and disbelieved Bobby's testimony that the addition increased the property's value. *See City of Keller*, 168 S.W.3d at 819. Moreover, the trial court reasonably could have believed that any financial damage Yolanda's actions caused Graceland's business operations was an innocent mistake and that the $30,000.00 she removed from the community account was offset by having to pay her own attorney fees and costs, which amounted to almost half of that amount. *See id.*; *see Zeptner*, 111 S.W.3d at 740. Furthermore, there was ample evidence that, throughout the marriage, both parties were guilty of placing substantial amounts of community funds in private, business, or otherwise noncommunity accounts, giving the trial court reasonable grounds to deny reimbursement to either party.

13

## III.    Conclusion

Here, we must presume that the trial court's division is just and equitable because, as detailed hereinabove, there is a reasonable basis for doing so. *See Pletcher*, 9 S.W.3d at 446. Because Bobby failed to demonstrate from evidence in the record that the division was so unjust that the trial court abused its discretion, we deny this point of error.

We affirm the trial court's final decree of divorce. *See Bigelow,* 286 S.W.3d at 620.


Ralph K. Burgess
Justice


Date Submitted:        October 10, 2018
Date Decided:         December 7, 2018

14