IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 6, 2024

## CORDERRO AVANT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 14-04590     Carolyn Wade Blackett, Judge**

---

### No. W2023-01409-CCA-R3-ECN

---

In 2014, a Shelby County jury convicted the Petitioner, Corderro Avant, and a co-defendant, of several charges against several victims of a shooting, including one count of first degree premeditated murder; one count of attempted first degree murder resulting in serious bodily injury; nine counts of attempted first degree murder; and eleven counts of employing a firearm during the commission of a dangerous felony. The trial court imposed an effective life sentence plus twenty-one years. The Petitioner appealed and this court affirmed the judgments. *State v. Avant*, No. W2018-01154-CCA-R3-CD, 2019 WL 3072131, at *1 (Tenn. Crim. App. 2019), *perm. app. denied* (Tenn. 2020). Thereafter, the Petitioner filed a petition for a writ of error coram nobis. The trial court denied the petition after a hearing on the basis that the statute of limitations had expired. On appeal, the Petitioner contends that his petition was timely and should have been granted based on newly discovered evidence. After review, we affirm the trial court's judgment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and TOM GREENHOLTZ, J., joined.

Shae Atkinson (at hearing) and Biana Y. Valdez (on appeal), Memphis, Tennessee, for the appellant, Corderro Avant.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; and Steven P. Mulroy, District Attorney General; and Carrie Shelton Bash, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

# I. Facts and Background

This case arises from the Petitioner's involvement in the shooting death of Dominique Thomas, the attempted murder of Jarvis Clayborn, who suffered serious bodily injury, and the attempted murder of nine other occupants of the victim's residence. In an opinion addressing his direct appeal, our court summarized the facts as follows:

> [The Petitioner and a co-defendant] were indicted in September of 2014 by the Shelby County Grand Jury in a multi-count indictment for their roles in a shooting on Patterson Street in Memphis in August of 2014. The mayhem resulted in the death of Dominique Thomas, the victim, and the injury of Jarvis Clayborn. [The Petitioner and his co-defendant] were indicted for one count of first degree premeditated murder, eleven counts of attempted first degree premeditated murder, and eleven counts of employing a firearm during the commission of a dangerous felony.

> At trial, Deputy Justin Brock of the Shelby County Sheriff's Department explained that he responded to a call about a "shooting and disturbance" at a home on Patterson Street in Memphis on August 22, 2014. This was not the first time Deputy Brock had responded to a call at the residence. When he arrived, "several people [were] standing outside the residence," and there were also people inside the residence. He observed more than twenty shell casings of different calibers "in the street, on the driveway, in the front yard, [and] up around the front door." The glass in the front door of the residence was "on the ground," and the windows were "shot out on the front part of the house." Deputy Brock saw the victim and a handgun on the couch and "lots of blood." As he assessed the scene, he found several small children in the front bedroom of the residence and Mr. Clayborn in the northeast bedroom.

> . . . .

> Mr. Clayborn testified that at the time of the shooting, he was fifteen years old and attending school. He recalled that on the day of the shooting, he "left school early" because he was expelled. Mr. Clayborn was sitting on the couch and talking to other people that were staying in the house, including his mother and the victim. Mr. Clayborn "tried to get up and go in [his] room" when the shooting started. He was shot in the "side." He had no recollection of how many shots were fired because everything "went black" after he heard "the first couple" of shots. The bullet that hit Mr. Clayborn did not exit his body. He was able to walk out of the house and

2

had to step over the victim's body to get outside. Mr. Clayborn was eventually taken to the hospital where he remained for nine days after doctors removed his spleen. Mr. Clayborn admitted that he used to be a "Blood" but was no longer affiliated with the gang.

. . . .

Frederick Ware was also present at the home on Patterson the day of the shooting. He was seventeen years old at the time. By the time of trial, he was twenty-one and was in custody on a charge of aggravated assault. Mr. Ware knew both [the Petitioner and his co-defendant] at the time of the incident but "[n]ever had a beef with them."

. . . .

On the day of the shooting, Mr. Ware was seated in a white chair on the porch of the Patterson house and was talking on the phone for "probably about an hour after school let out." Mr. Ware saw "a gray Impala pull up [outside the home] and a white Camry." The passenger side of the cars were closest to the home. He knew the Camry because it was "Little C's girlfriend's car." Mr. Ware saw three people in the white car, including "Little C" in the front seat and "DD" in the back passenger side. He did not identify the third person in the car. Mr. Ware saw two "big guns" and a handgun in the white car before the shooting started. He described the big gun as an "AK, Draco." They "got to blasting," and he "balled up" and started to fire the "9" he carried on his hip at the white Camry. He emptied his weapon and ran into the house. When he ran inside, the victim called his name. She was "on the floor holding her stomach." Mr. Ware "called her name a couple of times" before "blood started running out of her mouth." Mr. Ware covered the victim up and ran to the back of the house where he discovered Mr. Clayborn had been "shot in the rib" and was crying. He told "the kids" to hold a towel on Mr. Clayborn's gunshot wound, and he "dipped" or ran because he was "scared . . . and didn't want nothing to do with nothing." Mr. Ware identified both [the Petitioner and the co-defendant] in a photographic lineup. On cross-examination, Mr. Ware admitted that he was a Blood until "Little C and them say I'm snitching," and he "can't be [a] Blood no more."

*Avant*, at *1-4. For these crimes, the jury found the Petitioner guilty of the first degree murder of Mr. Thomas in Count One; the attempted first degree murder resulting in serious bodily injury to Mr. Clayborn in Count Two; and the attempted first degree

3

murder of the nine other victims present in Counts Four through Twelve. The jury also found the Petitioner guilty of employing a firearm during the commission of a dangerous felony in Counts Thirteen through Twenty-Three. The trial court merged the conviction for employing a firearm during the commission of a dangerous felony in Count Thirteen with the conviction for first degree murder in Count One. It then sentenced the Petitioner to life plus twenty-one years. *Id.* at *5.

In 2023, the Petitioner filed a petition for a writ of error coram nobis, alleging that a trial witness had recanted his testimony. The trial court held a hearing, at which the following evidence was presented: Charles Mitchell testified that he represented the Petitioner in his criminal trial on these charges. Mr. Mitchell agreed that he "roughly" remembered Mr. Ware testifying at trial that he was on the porch of the residence during the shooting and that the Petitioner was one of the individuals who fired shots towards the residence. Mr. Mitchell was shown a letter, written by Mr. Ware, on the day of the coram nobis hearing, that "basically" stated Mr. Ware had been "forced into his statement to police and then he was paid off for his testimony."

On cross-examination, Mr. Mitchell recalled that Mr. Ware was the primary eyewitness to the shooting and that Mr. Mitchell discredited his testimony at trial with many inconsistent statements and preliminary hearing testimony. Mr. Mitchell clarified that Mr. Ware's statement to police, preliminary hearing testimony, and trial testimony were all slightly different, mostly about whether his eyes were open or closed during the shooting. On recross-examination, Mr. Mitchell agreed that Mr. Ware's testimony was that he saw the Petitioner with a gun in his hand shooting from the vehicle.

Frederick Ware testified that he remembered his trial testimony that he saw the Petitioner shooting that day. He agreed that he testified that the Petitioner was wielding "big guns" such as a "AK" or a "Draco." Mr. Ware testified that several years after the trial, he gave a sworn statement recanting his testimony. He testified that he lied at the Petitioner's trial in order to go home.

Sarah Poe, employed by the District Attorney's Office in Shelby County and tasked with prosecuting the Petitioner's case, testified that she did not promise anything to Mr. Ware in exchange for his testimony against the Petitioner and his co-defendant.

At the conclusion of the hearing, the trial court denied the petition, stating in an order:

> Here, the Petitioner filed outside of the one year statute of limitations, thus, the Petitioner's writ of error coram nobis has . . . not been timely filed. Although this petition has not been timely filed[,] Tennessee

4

law does allow for a "tolling" of the statute of limitations in certain cases on a case-by-case basis.

. . . .

The court must use the factors presented by the Tennessee Supreme Court to determine whether fairness to the Petitioner requires tolling the statutory period in which this writ must normally be filed.

Here, this Court does not find that equity requires a tolling of this statute. First, the grounds upon which the Petitioner is seeking relief is not later arising because the recanted testimony of Jaylen Johnson also known as Frederick Ware was presented at the original trial. Although the witness did recant his testimony from the original trial, the attorney was able to attack the credibility of Mr. Ware by getting him to admit that his eyes were not open when the shooting took place. Second, because Mr. Ware's credibility was already called into question at the original trial, the Petitioner has already had the opportunity to attack the credibility of the witness. Finally, because the Petitioner has already had the opportunity to cross exam[ine] the witness and his attorney did successfully impeach the witness, none of the Petitioner's constitutional rights have been infringed upon. Because the witness's credibility was successfully called into question at the original trial, the witnesses recanted statement is not enough to show a new ground for relief that was not available at the time of the trial. In short, this petition is untimely, and equity does not require that the statute of limitations should be tolled in this circumstance.

. . . .

*The "New Evidence" is Not Credible*

If the Court deems that the witness who recanted his testimony is not credible, then relief should not be granted. In the instant case, this Court has found that the testimony of Frederick Ware, the witness who recanted his testimony is not credible, therefore, it would not have resulted in a different outcome from the original trial. Although Mr. Ware recanted his testimony in an affidavit, he could not recall what he said at the trial, nor could he recall what he said in his new statement. Although it is reasonable that Mr. Ware would not remember his testimony from five years prior, he should be able to recall what he wrote in his statement which recanted his original testimony. Additionally, the Petitioner did not present evidence

5

that would give the Court reason to believe that Mr. Ware's new statement is credible, when he admitted to giving false testimony under oath because it was in his best interest [to] do so. Because Mr. Ware could not remember details of his testimony and Petitioner could not show why Mr. Ware's new statement should be given weight over his prior testimony, his statements are not credible, thus, they would not change the outcome of the Petitioner's previous trial.

The Petitioner has presented insufficient evidence to show that the recanted testimony is newly discovered or that the new testimony is credible. Thus, the Petition for a Writ of Error Coram Nobis is denied.

It is from this judgment that the Petitioner now appeals.

### III. Analysis

On appeal, the Petitioner argues that the trial court erred when it denied his petition for a writ of error coram nobis as untimely because the claim for relief was subject to equitable tolling of the statute of limitations. He also contends that newly discovered evidence may have altered the judgment of the jury. The State responds that the coram nobis court properly determined that the petition was barred by the statute of limitations and not subject to tolling. The State further responds that the Petitioner did not present newly discovered evidence that was likely to change the outcome of his trial and thus, the trial court properly dismissed his petition for a writ of error coram nobis.

Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which are litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at trial.

The relief sought by a writ of error coram nobis is the setting aside of the conviction and the granting of a new trial. *Payne v. State*, 493 S.W.3d 478, 485 (Tenn. 2016) (citation omitted). "As a general rule, subsequently or newly discovered evidence which is simply cumulative to other evidence in the record . . . will not justify the granting of a petition for the writ of error coram nobis when the evidence, if introduced," might not have resulted in a different outcome. *State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995) (citations omitted); *see also State v. Vasques*, 221 S.W.3d 514,

6

527-28 (Tenn. 2007) (noting that proper standard of review is whether the proffered evidence "might have" resulted in a different outcome rather than whether it "would have" resulted in a different one).

It is well-established that the writ of error coram nobis "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999). The decision to grant or to deny a petition for the writ of error coram nobis on its merits rests within the sound discretion of the trial court. *Ricky Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *Vasques*, 221 S.W.3d at 527-28). We, therefore, review for abuse of discretion. *See State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002).

The Petitioner acknowledges that he filed his petition for relief in February 2023, three years after the statutory period had expired in June of 2019. He contends, however, that the grounds for relief qualified as later-arising because the recanted testimony of Mr. Ware did not come to light until 2022. The State responds that the petition was untimely and that, even if the newly discovered evidence does qualify as later-arising, the Petitioner unreasonably waited over six months to file his petition and therefore is not subject to tolling of the statutory period. The State also argues that the coram nobis court correctly found that Mr. Ware was not a credible witness whose new statement might have changed the outcome of the trial. We agree with the State.

A petition for a writ of error coram nobis must be filed within one year of the judgment becoming final in the trial court. T.C.A. § 27-7-103. This statute of limitations "is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed post-trial motion." *Nunley v. State*, 552 S.W.3d 800, 816 (Tenn. 2018) (quoting *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999)); T.C.A. § 27-7-103. Compliance with the one-year statute of limitations is an "essential element of a coram nobis claim." *Nunley*, 552 S.W.3d at 828.

If the coram nobis petition does not show on its face that it was filed within the one-year statute of limitations, the petition must set forth with particularity facts demonstrating that the defendant is entitled to equitable tolling of the statute of limitations:

> To be entitled to equitable tolling, a prisoner must demonstrate with particularity in the petition: (1) that the ground or grounds upon which the prisoner is seeking relief are "later arising" grounds, that is grounds that arose after the point in time when the applicable statute of limitations normally would have started to run; [and] (2) that, based on the facts of the

case, the strict application of the statute of limitations would effectively deny the prisoner a reasonable opportunity to present his or her claims. . . . A prisoner is not entitled to equitable tolling to pursue a patently non-meritorious ground for relief.

*See Nunley*, 552 S.W.3d at 831. "[T]he coram nobis statute of limitations may be tolled only if the petitioner produces newly discovered evidence that would, if true, establish clearly and convincingly that the petitioner is actually innocent of the underlying crime of which he was convicted." *Clardy v. State*, 691 S.W.3d 390, 409 (Tenn. 2024).

Reviewing the record and the petition, we find no error in the coram nobis court's decision to deny the petition. The newly discovered evidence of Mr. Ware's statement that his eyes were closed during the shooting, if credited, which we note it was not, does not "clearly and convincingly show that the petitioner is actually innocent of the underlying crime, i.e., that the petitioner did not commit the crime." *Clardy*, 691 S.W.3d at 409. Because the Petitioner has not demonstrated that the newly discovered evidence establishes his actual innocence as required to entitle him to equitable tolling of the statute of limitations as provided in section 27-7-103.

The inquiry ends if his petition is not timely and if he has failed to demonstrate that he is entitled to relief from the statute of limitations. On its face, the petition is untimely under the one-year statute of limitations, and it contains no specific facts showing a basis for holding that he is entitled to equitable tolling of the statute of limitations.

Furthermore, the Petitioner has failed to demonstrate a meritorious ground for relief because the coram nobis court determined that the newly discovered evidence was not credible.

## IV. Conclusion

Based upon the foregoing reasoning and authorities, we affirm the coram nobis court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

8